### GUNNARSON et al. v. ROBERT JACOB, Inc.*
### No. 159.

Circuit Court of Appeals, Second Circuit.
Jan. 10, 1938.

Dunnington, Bartholow & Miller (by Single & Tyler), of New York City (Forrest E. Single, Douglas D. Crystal, and Wilbur H. Hecht, all of New York City, of counsel), for appellants.

Bigham, Englar, Jones & Houston, of New York City (George S. Brengle, James

*Writ of certiorari denied 58 S.Ct. 764, 82 L.Ed. ——.

N. Senecal, and Edward P. Greene, all of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This appeal arises from a decree in the admiralty, dismissing two claims filed in a proceeding to limit a shipowner's liability; one, that of the widow of Andrew Gunnarson, to recover for his death from an explosion on July 16, 1936, on board the yacht, "Nimbus," of which he was master; the other, that of Andrew Gunnarson's son, Arthur, who suffered injuries at the same time. The explosion was of protane gas, shipped in a tank on board the "Nimbus" for cooking purposes, and the theory of the claimants is that its presence, as it was stowed, made the yacht unseaworthy. Protane gas is in common use both ashore and afloat, but it is highly explosive when mixed with two per cent of air or less; and for this reason extreme precautions are necessary to prevent its escape. It is sold in tanks under pressure and will therefore leak, if there is any opening even in the top; as it is heavier than air, it will flow when free like liquid to the lowest spot accessible. The tanks are closed by iron "manifolds," or stoppers, threaded to fit into the copper threading of a throat in the tank top, and it is vital that the "manifold" shall not cut the copper threading, else the gas will leak out. The "Nimbus" was a sailing yacht with an auxiliary engine, or "kicker," which filled the lazarette, where otherwise the protane tank might have been stowed; it was not customary, and probably was not possible, to stow it on deck, although this at times it done on motor boats. It was set in the galley, forward of the water tank; from its "manifold" a pipe led to the stove at the after end of the galley, close to a bulkhead that separated it from the cabin. Andrew Gunnarson had been captain of the "Nimbus" during the seasons of 1935 and 1936; he was an experienced yacht master and had installed several protane tanks before. Finding his supply of gas exhausted, he purchased another tank from an oil barge nearby, and when this was brought alongside about noon, lifted it on deck with the help of Arthur Gunnarson, who had come aboard that morning, and was waiting about to begin work in the afternoon on a nearby boat. The two men then let the tank down through a hatch into the galley, and set it in its place forward of the water tank. Andrew Gunnarson should have screwed the "manifold" in place before the tank was carried below, so as to make sure that the copper threading should not be crossed; but instead, he waited till it had been stowed, when it became a troublesome job. Arthur Gunnarson handed him a wrench, and it is agreed that in screwing on the "manifold" he crossed the copper threading and set the gas leaking. He then made connection from the "manifold" to the stove, and went aft in the galley to cook some coffee. As soon as he lighted a match, the explosion occurred. Arthur Gunnarson had come aboard without any definite purpose, except to see his father; but while there, Andrew set him to work polishing brasses, and got his help in installing the tank, as we have said. He had brought some beer on board which the two drank, but at the time of the explosion he had finished anything which his father had required of him, and was apparently merely watching him get ready his coffee, which he was not even to share. The judge held that it was lawful to use protane gas on board such yachts; that the best place to stow the tank was where it was put; that the yacht was therefore seaworthy; that Andrew Gunnarson had been negligent in cross-threading the "manifold," and that Arthur Gunnarson was not a business visitor, and was entitled to no care except that due a licensee. For these reasons he dismissed the claims; the claimants appealed.

We agree as to the dismissal of Arthur Gunnarson's claim; he was not an "invited person," or "business visitor"; and the owner of the "Nimbus" owed him no duty of affirmative care. The doctrine is well settled; the relation with its resulting duty arises only when the person who enters the premises does so in the interest of the owner, or upon some business of his own, of which the owner has notice and to an entry in pursuit of which he consents, directly or indirectly. New York Lubricating Oil Co. v. Pusey, 2 Cir., 211 F. 622; Middleton v. P. Sandford Ross, 5 Cir., 213 F. 6; Mideastern Contracting Corporation v. O'-Toole, 2 Cir., 55 F.2d 909; Radoslovich v. Navigazione Libera Triestina, 2 Cir., 72 F.2d 367; Restatement of Torts, § 332. It is answered that Andrew Gunnarson needed his son's help to lift the tank aboard —it weighed 75 pounds—and thereafter to set it in place; and that, as he might have,

called some one from the shore to help him—there were a number of workmen about—so he might make use of Arthur, when he chanced to be already at hand. Even so, any help that Arthur Gunnarson had been giving had come to an end; at most he was only engaged in placing the tank in position, and in passing the wrench. His further presence was in no sense necessary to his father's work; he had already had time enough to leave the yacht, and stayed on board, not as part of any undertaking in the owner's interest, but altogether for his own purposes.

As to Andrew Gunnarson the case appears to us otherwise. We agree with the judge who accepted the testimony of the owner's expert, Thomas, that there was no better place to put the tank on board the "Nimbus." We agree also that a bulkhead shutting it off would have been of doubtful value; it might have rotted, in any event unless it was gas tight, it would not have prevented, though it might have delayed, the flow of gas into the galley. But to say that such a tank was safest where it was put, is not to say that it was safe at all, and we do not think that it was, without more care on the owner's part. It is of no moment that it was harmless so long as it did not leak, and that it would not leak if it was properly handled. In such cases liability depends upon an equation in which the gravity of the harm, if it comes, multiplied into the chance of its occurrence, must be weighed against the expense, inconvenience and loss of providing against it. The harm may be so great as to impose an absolute liability regardless of any negligence; in such cases the very activity, though lawful, entails responsibility, and reparation becomes a cost of the enterprise, as under workmen's compensation. Exner v. Sherman Power Construction Co., 2 Cir., 54 F.2d 510, 80 A. L.R. 686. The chance that some one might be careless in installing the "manifold" was by no means impossible; indeed, without warning it was extremely probable, and it was a hazard against which provision should have been made. It was therefore essential to instruct Andrew Gunnarson that on no account must he allow the "manifold" to cut the copper threading, and to enforce obedience to that order, so far as was reasonably possible. Without warning he might well think it no great matter whether he used a wrench to screw down the "manifold." Considering the risk to which this exposed him, it was negligent to leave him to his own devices. We need not therefore say that the mere presence of the tank in the galley, where the gas might flow to the stove, made the yacht unseaworthy; but we do say that if such a tank was to be used in such a place, the owner did so at his own peril, unless he gave and enforced the orders we have described. This was never done. Little need be added as to Andrew Gunnarson's contributory negligence. Negligent indeed he would have been, if he had known the danger, but not as things were. The successful handling of such tanks in the past told him nothing, and he had no reason a priori to suppose that such a trifling cause would have such grievous consequences. For these reasons Andrew Gunnarson's administratrix proved a good claim, as to which the owner may not limit its liability, for it was necessarily privy to the fault.

Decree reversed as to the claim of Emely Gunnarson as administratrix; decree affirmed as to that of Arthur Gunnarson.