INOCENCIA FIGUEROA WIDOW OF DELGADO ET AL., Plaintiffs and Appellants, *v.* BOSTON INSURANCE COMPANY, Defendant and Appellee.

No. R-68-234. Decided March 11, 1971.

694

696

*Amadeo & Benet* and *Rodolfo Gluck* for appellants. *Castro & Castro* for appellee.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

Contrary to the decision of the trial court, we conclude that under the circumstances of this case, the owner of a motorboat is liable for the death of a cabinetmaker whom the former hired to help him to replace the gasoline motors of his boat for Diesel motors, death which resulted from an explosion which occurred at the place where the deceased

went, by orders of the owner, to drill some holes in the combustion tanks. It is proper, therefore, to order appellees to compensate the damages sustained by appellants, as determined hereinafter.

The evidence with respect to the circumstances of the accident consisted of the testimony of Wilfredo Beltrán, owner of the motorboat called "Contigo," and that of an expert in the handling of gasoline tanks. On February 4, 1966, there occurred an explosion in one of the gasoline tanks of said boat, as a result of which Ramón Delgado and Beltrán suffered burns, and the boat "Contigo" and other boats were burned. Delgado died as a result of the burns. He was a cabinetmaker. Beltrán hired him to help him "to remodel" the boat and mount a motor. During the three days prior to the accident, Beltrán and Delgado worked "installing a flange . . ." in the gasoline tanks "to make a pipeline connection to the Diesel motors which were to be installed in the boat." Those "flanges" are two bronze "plates," one is threaded and the other is not "to be connected with a coupling where a pipe is screwed, which pipe goes from there to the motor . . . and it is screwed tight so that whatever the liquid it does not leak." Beltrán knew how to perform the operation. They finished installing the "flanges" in the upper part of the tanks. Only the last two remained to be installed in the lower part of the tanks, at about one and a half or two inches from the bottom of the tanks. In order to do this, following Beltrán's instructions, Delgado was going to drill some holes which were needed. Beltrán was performing the same operation in the water tank when the explosion occurred. Beltrán saw Delgado for the last time before the explosion "preparing himself to continue doing that work." He said that when the explosion occurred he assumed that Delgado was drilling, but at that time "I was not looking at him drilling, he could be using the saw . . . but I do not think so"; that he presumes that there were fumes when the explosion occurred. Beltrán

testified when the explosion occurred "I remained stunned for a while. When I woke up the floor of the boat was over me, then, since the boat had already caught fire, then, Ramón Delgado was in the same place where he was working, he was stunned and I could not 'move' and the two of us came out with our clothes in flames." The auger or electric drill was by Delgado's side. The latter was working in the stern of the boat in the space where the combustion tanks were under the floor, which tanks were five feet long, three feet wide, and 14 inches high, with a capacity for 150 gallons each. When Beltrán was asked about the cause of the accident he said that "what I believe is that Ramón Delgado was drilling the holes in the tanks, I did not see him, then, apparently, when the auger became hot, the fumes inside the tanks caused the explosion, then the explosion caused the fire, because that was fiberglass material and when it catches fire it is like acetylene, when it catches fire it cannot be extinguished." He did not take other precautions to ascertain himself that there were no gasoline fumes in the tank. He said that the day before the explosion "I smelled it, but it did not smell of anything." Prior to the accident Beltrán had given away the sniffer of the boat, apparatus used to measure the density of the gasoline fumes. He did not know it was an ordinary precaution to maintain the combustion tanks full of water when work was being done in the boat in order to prevent explosions, nor did he take any action whatsoever to become acquainted with the foregoing, some mechanics "saw me working and did not tell me anything, I went on." He did not ask them. Beltrán had previously owned motor boats and had known for twenty years, what a drill is and its use. He said that when it is being used it becomes red-hot, sufficiently to burn and to set fumes on fire. He said he did not know this at the time of the accident. He repeated that the fire started in the tank and continued to spread out "because fiberglass [material of which the tank was made] burns rapidly." He

testified that he knew that gasoline changes into fumes, "but I did not know that that was going to happen" (the explosion); that Delgado did not know anything about tampering with gasoline tanks; that there was nothing in the boat that could produce the explosion, except for the gasoline tank; that "There can be nothing else." Delgado did not smoke. No cooking was being done in the boat when the explosion occurred, nor was there any person therein at that time.

The policy issued by appellee, which provides for an insurance up to $300,000 for the loss of life, injuries, and damages to property, was admitted in evidence.

The expert, Luis Hernández Bonet, testified that: "When a gasoline tank is going to be repaired, the first thing to do is to work in a ventilation system, ventilation is necessary; the second thing is to be very sure that there are no fumes, that is, explosive gases; there are several ways to prove this, either by means of an instrument or by means of the sense of smell. To take the proper precautions the most important thing is to wash the tank at least two or three times, and when work is to be done on the tank it should be full of water with the 'plots' open"; that if such precautions are not taken an explosion may occur in more than 70% of the cases; that one is aware of the fumes through the sense of smell; that, as a general rule, the fumes settle in the lower part of the boat; if the smell of the fumes is not perceived, work may be done "provided the precautions are taken"; that not "every person" knows that such precautions should be taken.

The trial judge, in dismissing the complaint, concluded that:

(1) "There was no evidence as to the cause of the explosion, except conjectures and suppositions. There was no evidence either as to the acts being performed by the deceased when the explosion occurred in the gasoline-tank room. The last time the deceased was seen he was on the deck of the boat, five minutes before the explosion."

(2) "The insured and the deceased took the security measures that a prudent and ordinary person would have taken under similar circumstances."

(3) "There are no proved facts ... from which we can infer the presumption that the explosion and the fire were caused by acts or instrumentalities for which the insured is liable; that it cannot be inferred that when the explosion occurred the deceased was drilling one of the tanks and that the drill became hot or produced a spark, and for that reason the fumes caught fire in the tanks which caused the explosion; that the doctrine of *res ipsa loquitur* is not applicable, since the accident occurred in a place which was not under the exclusive control of the insured."

Appellants assign, in synthesis, that the trial court erred in the weighing of the evidence, in concluding that Beltrán was not negligent.

For the purpose of deciding, we must determine, if possible, first, where did the explosion originate and which was its cause; second, whether the owner of the boat was negligent in this case and whether said negligence was the proximate cause of the accident; and third, whether the deceased was negligent and in what degree.

From the preceding summary of the testimony concerning the accident, the following facts have been established:

(1) Beltrán, the owner of the boat, controlled, directed and participated in the operation of fixing the combustion tanks of said boat.

(2) Delgado was a cabinetmaker hired by Beltrán to help him in the aforementioned task. He did not know how to tamper with gasoline tanks.

(3) Beltrán (a) had used the electric drill for 20 years; (b) knew that there were fumes in the gasoline tanks, a dangerous circumstance; that to eliminate them they left some holes open, drained the tanks, and wiped them with a stick and a rag; (c) that the day prior to the accident he smelled the tank, but "it did not smell of anything"; (d) he

did not know any other precautions that should be taken; that he did not investigate whether there were any and which they were.

(4) A short time before the explosion Beltrán ordered Delgado to drill some holes, for the last flanges, in the very bottom of the tank. He saw him for the last time before the explosion when he was going to drill them.

(5) Beltrán discharged as nonexistent every other possible cause of the explosion, other than the drilling of the tank.

(6) The possible explanation as to why the tank did not explode when it was drilled at the top and it did explode when the drilling was done very near the bottom, is that the gasoline fumes tend to descend to the lowest part of the place where they are.

We mention below the rules of law applicable to the case at bar.

■ 1.—In *López* v. *García*, 86 P.R.R. 666, 671 (1962), we said that once this Court has exercised its discretion by deciding to review a case, the review covers the findings of fact subject to certain applicable norms.

■ 2.—In *Rodríguez* v. *Ponce Cement Corp.*, 98 P.R.R. 196 (1969), we said that although the burden of the proof rests on plaintiff, he is not required that degree of proof, which, excluding the possibility of error, produces absolute certainty; that "The absence of direct evidence having been satisfactorily explained—due to the absence of . . . eyewitnesses and to plaintiff's incapacity as a consequence of the accident itself—this obligation could be performed by the presentation of indirect evidence, in this case, inferences. All that was required was the presentation of evidence in the light of which a reasonable person could be convinced that the wrongful act was due to defendant's fault."

■ In *Murcelo* v. *H. I. Hettinger & Co.*, 92 P.R.R. 398, 412 (1965), we said that ". . . The litigant may prove his

case through indirect evidence, which is of two kinds, inferences and presumptions. Inference is the deduction from the facts proved or fully established made by the trier in his discernment. Sometimes it is characterized as *hominis* presumption. That discernment represents an evaluating human activity of comparison or confrontation, an internal process which constitutes, in the opinion of professor Serra Domínguez, something unapproachable: the movement of man's reason."

■■ In *Renfro* v. *J. D. Coggins Company*, 378 P.2d 130 (N. Mex. 1963), it was held that a plaintiff is not required to prove the negligence beyond a reasonable doubt, but the circumstances shown by the evidence should be sufficiently strong that the trial court might properly, on the grounds of probability existing in the case, exclude inferences favorable to the defendant. It is not sufficient to show that the negligence charged might fairly and reasonably have caused the injury, if the circumstances shown indicate an equal probability that it was due to some other cause. *Grange* v. *Finlay*, 364 P.2d 234 (Wash. 1961); *Lindgren* v. *Voge*, 109 N.W.2d 754, 760 (Minn. 1961).

■■ 3.—It is generally known that gasoline produces fumes which by reason of being heavier than the air, tend to settle in the bottom of the receptacle or place where they are, and that both are highly explosive and inflammable. The person who has the control or the right to the control of the place or operation, where the foregoing circumstances concur, must give warning of the existing danger, as well as of the precautions that should be taken, to the persons who, on his invitation, are found in said place. Said person must exercise great care and take all the precautions he had or should have knowledge of, to prevent such danger. *Moore* v. *Beard-Laney, Inc.*, 139 S.E.2d 879 (N.C. 1965); *Mathis* v. *Lukens Steel Co.*, 203 A.2d 482 (Pa. 1964); *Taormina Cor-*

*poration* v. *Escobedo*, 254 F.2d 171, 174 (5th Cir. 1958); *Wichita City Lines* v. *Puckett*, 295 S.W.2d 894 (Texas 1956); *Dean* v. *Coombs Motor Co.*, 97 N.E.2d 531 (Mass. 1951); *Gunnarson* v. *Robert Jacob, Inc.*, 94 F.2d 170, 172 (2d Cir. 1938); *Nelson* v. *Zamboni*, 204 N.W. 943 (Minn. 1925); *Carpenter* v. *Sinclair Refining Co.*, 129 N.E. 383 (Mass. 1921). See, also, the monograph entitled *"Liability of owner or operator of motorboat for injury or damage— Explosions and fires,"* 63 A.L.R.2d 343, 389–390.

▮▮▮ 4.—Negligence must be established by evidence or by inference drawn from established facts. It might be established when the proof permits men of reasonable minds to conclude that there is a greater probability that the fire happened in such a way as to fix liability upon the person charged therewith than it is that it happened in a way for which a person charged would not be liable. In applying the circumstantial evidence submitted to prove a fact, the trier of fact must recognize the distinction between that which is mere conjecture and what is reasonable inference. *Wolverine Upholstery Company* v. *Ammerman*, 135 N.W.2d 572, 579 (Mich. 1965); *Chaloupka* v. *Cyr*, 387 P.2d 740, 745 (Wash. 1964).

▮▮▮ 5.—The requirement that plaintiff must prove facts from which defendant's negligence may be reasonably inferred does not imply the exclusion of all possible causes other than the one alleged. It must be established, however, that the possibility of such other causes is so reduced that the greatest possibility is that defendant's negligence was the proximate cause of the accident. Although a reasonable inference that defendant's negligence was the proximate cause of the accident is required, it is not necessary to prove with mathematical accuracy that the accident was due to a cause, excluding all other probabilities, but it must be shown that none of the latter, in case of being fairly suggested by the

evidence, was the cause. Otherwise stated, it is not necessary that plaintiff exclude all probability that his injury was caused by the negligence of other persons other than the defendant. On the part of defendant it is not sufficient to merely refer to other possible causes of a fire for which causes defendant is not liable and which could have caused the damage. Possible or probable causes do not mean conjectures or speculations on possible causes. Proof of a sufficient cause of an accident, together with circumstances strongly indicating that it is the true cause, can only be rebutted by other proof in the sense that the death or injury was caused by another cause. We said in *Rodríguez* v. *Ponce Cement Corp., supra,* that the fact that an accident could have resulted from other causes is not sufficient by itself to defeat a claim. It is only necessary that the court consider that the action or omission indicated by plaintiff was the most probable cause of the accident. *Kuster* v. *Gould National Batteries, Inc.,* 429 P.2d 220 (Wash. 1967); *Parlow* v. *Dan Hamn Drayage Co.,* 391 S.W.2d 315 (Mo. 1965); *Cuthbert* v. *City of Philadelphia,* 209 A.2d 261 (Pa. 1965); *Sommer* v. *Yakima Motor Coach Co.,* 26 P.2d 92 (Wash. 1933).

Applying the preceding rules, liability was attributed (1) in *Kuster, supra,* to the manufacturer of a battery, for the injuries sustained by a mechanic after he connected the battery to another which was dead; (2) in *Grange, supra,* to the owner of a cruiser for fire damage to moorage at midnight, where he moored his boat one afternoon, it being indicated that during the trip before mooring, said owner had repeatedly extinguished fire on board and did not remove from the cabin a mattress which had caught fire, on which mattress he poured water on on several occasions; (3) in *Dean, supra,* to the owner of a repair shop, for the destruction of a truck by fire, when they raised the rear of the truck to replace two rear spring shackles, and proceeded to burn off some studs with an acetylene torch, the court concluding that the incan-

descent sparks from the torch ignited the gasoline which should have overflowed from the tank situated in the center of the truck when the latter was inclined at a 30-degree angle; (4) in *Gunnarson, supra,* to the owner of a yacht for injuries caused to the captain as a result of an explosion when the latter accidentally cut a copper threading of throat in a tank containing protane gas, in the course of the installation of another, as a result of which he set gas leaking, the court concluding, by word of Judge Learned Hand, that "The chance that some one might be careless in installing the 'manifold' was by no means impossible; indeed, without warning it was extremely probable, and it was a hazard against which provision should have been made. It was therefore essential to instruct Andrew Gunnarson that on no account must he allow the 'manifold' to cut the copper threading, and to enforce obedience to that order, so far as was reasonably possible"; (5) in *Sommer* v. *Yakima Motor Coach Co., supra,* to the owner of a motor stage in which fire had been repeatedly extinguished during the run, for the destruction by fire of the building in which the former was parked.

In *Nelson, supra,* a client of a gasoline filling station died as a result of an explosion which occurred in the filling station, for which cause no evidence was adduced. The complaint for damages for said death having been dismissed and an order denying a motion for new trial having been entered, said order was reversed, in concluding that the doctrine of *res ipsa loquitur* was applicable to the case, since the accident was of a kind not likely to happen, if those in control of the instrumentality had used a degree of care commensurate with the danger, since the propensity of gasoline to vaporize and thereby produce material for a violent explosion is well known and ordinarily controlled by due care.

In the case at bar the operation of drilling a gasoline tank was greatly dangerous on account of the explosive nature of this fuel and of the fumes it generates, residues of which

remain, as it is generally known by owners and operators of boats and motorboats, not only in the bottom of the tanks when the latter are drained, but also in the space under the floor where the tanks are situated. It is also well known that the most effective precaution to prevent an explosion when proceeding to drill a gasoline tank, in addition to removing it from the place where it is, is to maintain it completely full of water. The owner of the yacht in this case, and under whose control and direction the change of motors and the modifications in the tanks were performed, should have known and ascertained himself of these precautions and be sure that no drilling be performed until the same were complied with. Not only was he negligent in failing to take them, but he was also negligent in failing to give warning to Delgado of the existing danger, since the latter obviously lacked knowledge thereof, since he was a cabinetmaker hired by the owner to help him in the task in question.

██ Although the cause of the explosion and the fire in the boat was not verified with absolute certainty, the owner himself admitted that the accident had not been caused by different causes, leaving as possible cause the drilling of one of the tanks by Delgado. The inference that the latter was the proximate cause of the explosion is supported by the evidence. A short time before the accident, appellee had ordered Delgado to proceed to drill in the lower part of the tank, almost at the bottom of the same, and he saw him for the last time prior to the event "preparing himself to continue doing that work." After the explosion the drill appeared at the place of the explosion. Some days before, the gasoline which the tank contained had been drained and they had proceeded to wipe the interior of the tank with a rag. This operation could not prevent that residues of the fumes remain in the bottom of the tank, and, also, in the bottom of the limited space where the tanks were located under the floor of the deck in the stern of the yacht. Precisely, because these fumes have the

tendency to remain at the bottom of the tank and of said place, when holes were drilled in the upper part of the tank no explosion or fire whatsoever occurred. But when Delgado started to drill near the bottom of the tank with an electric drill, it may be inferred that one of the two things happened, either the fumes in the bottom of the place came in contact with the red-hot drill, or with a spark produced by the same; or the fumes in the bottom of the tank came in contact with the excessive heat of the drill. Any of these situations could produce the explosion and the fire. Appellee anticipated these dangers, but he was negligent in failing to take the aforementioned precautions. He was bound to know them, to ascertain them and to take them, as well as to warn the deceased of the danger involved in the operations and instruct him on the aforementioned precautions, and ascertain that he took and followed them. Therefore, we conclude that the insurer of the owner of the yacht should be held liable for the damages caused by the said explosion, including those resulting from the death of the artisan in question.

Let us see the damages caused as a result of the death of said worker.

 It is proper to consider the loss of earnings as element of damage. According to the evidence adduced, Delgado was a craftsman who received weekly wages amounting to $100. He died when he was 48 years old, so he had a useful life expectancy of 17 years. The rules to determine the amount of such damages in a case like this are set forth in *Rodríguez* v. *Ponce Cement Corp., supra,* and in *Widow of Seraballs* v. *Abella Hernández,* 90 P.R.R. 360 (1964). We must explain that the damages for loss of earnings must not be exclusively determined on the basis of the mathematical equation referred to in the preceding cases. The same is only one of the factors, in addition to all the circumstances of the case, which may be taken into consideration for the purpose of determining the reasonableness of the amount in

which the loss of earnings is estimated. For said purpose the evidence available on the health condition of the deceased before the accident, and the average income derived from his work during several years prior to the event which caused his death, must be adduced. After having considered all the circumstances of the case, we conclude that the present fair value of the loss of earnings is the amount of $30,000, of which $14,000 correspond to the widow, $4,300 to each one of the minor children, and $3,100 to the oldest daughter.

For the mental anguish suffered by Delgado's widow in beholding his horrible suffering produced by the extensive burns covering three-fourths of his body, which caused his death three days after he sustained them, and in finding herself deprived of his company, the amount of $20,000 should be granted to her as just and reasonable compensation for damages which are actually irreparable.

For the damages suffered by the three minor children, in being deprived of their father's company, love, and guidance in their emotional and spiritual development at the tender age when it is most necessary, we conclude that it is proper to grant the amount of $10,000 to each one. Those for the oldest daughter, by a previous marriage, we fix in the amount of $5,000, since the latter was a widow who came back to live in her father's house only two years prior to the accident. *Jordán* v. *Sindicato Empleados*, 95 P.R.R. 667, 673 (1968).

It is also proper to order appellee to pay the deceased's hospital and funeral expenses, amounting to $1,217.60.

 In view of the fact that the court is divided with respect to the availability of the heirs' claim for damages for the sufferings of their predecessor Delgado during the three days he was in agony until he died as a result of the extensive and serious burns caused by the explosion and the fire in the boat, the court does not make any pronouncement on this occasion on the aforesaid question.

Mr. Justice Ramírez Bages delivered an explanatory opinion in which Mr. Justice Hernández Matos and Mr. Justice Rigau concur. Mr. Justice Martínez Muñoz did not participate herein.

—O—

Explanatory opinion of MR. JUSTICE RAMÍREZ BAGES, in which MR. JUSTICE HERNÁNDEZ MATOS and MR. JUSTICE RIGAU concur.

San Juan, Puerto Rico, March 11, 1971

I regret that the Court did not make any pronouncement on the availability of the action for damages brought by the heirs of a person injured in an accident and who died without having filed an action for moral anguish sustained as a result of said damages.

In the case at bar, appellants established that they were the heirs of the worker who died as a result of the burns sustained by him when the boat caught fire. To that effect they presented in evidence certified copy of the order of the court on declaration of heirship in the corresponding proceeding. In the complaint in this case the claim included "the amount for Delgado's physical and mental sufferings before he died," and in the appeal before us they assigned as error that the trial court had denied it to them.

Several arguments are adduced in support of the denial of this kind of claim. In my opinion they lack validity. We shall analyze them below.

1.—It is argued that it is not known whether the deceased would have decided to claim damages judicially. In view of the fact that appellee is the insurer of the employer who caused the accident in question, we must presume that if the worker had not died he would have joined in the complaint filed by his heirs, claiming the damages suffered by each and every one of them. There is no legal impediment whatsoever

to preclude making such presumption based on the reality prevailing in our community to the effect that when accidents occur, like the one in this case, all the injured persons invariably claim the damages sustained.

2.—That it is not necessary to specifically provide for the recovery of such damages, since in estimating the heirs' sufferings the courts take into consideration those suffered by the deceased. This argument is specious. We find nothing at law to justify this conclusion. It is possible that some judges unconsciously estimate the damages suffered by the heirs in a greater amount as a result of taking into consideration those suffered by their predecessor. But this separate reaction of the judges does not constitute a right. On the contrary, the determination of the court, now in the sense that the damages that the predecessor failed to claim when he was alive cannot be asserted, undoubtedly shall develop a tendency to the contrary in the judges in estimating the damages of the heirs, reducing them, since as a matter of law they cannot take into consideration those of such predecessor.

Obviously, this is not an argument based on a principle or juridic doctrine, but rather on an alleged reaction or attitude which may have some appearance of reality to some judges. We believe that it is not fair to decide as to the availability of a right on the basis of such a speculative argument as this one.

3.—That the law in this jurisdiction is rather contrary to the acknowledgment of such right, since in *Travieso* v. *Del Toro*, 74 P.R.R. 940, 945, 946 (1953), we said that ". . . the right of action for death is not part of the hereditary patrimony of the ancestor and it is not transmitted according to the law of successions. . . . No right of action was transmitted upon the decease of the ancestor, since said right was his own personal right and it abated by his death." This is an *obiter dictum*, since in *Travieso, supra*, the decision was that the right of action of the father for the death of his son did

not stem from his capacity as heir, but rather from the provision in § 1802 of the Civil Code (31 L.P.R.A. § 5141). In this case the father did not seek to recover for the sufferings caused to the deceased son.

In *P.R. Ry., Lt. & P. Co.* v. *District Court*, 38 P.R.R. 305, 313 (1928), we said that the right to claim damages for injuries received by a person through the fault or negligence of another after action has been brought and the issue joined cannot be compared to usufruct, use and habitation, any annuity of which the deceased was the recipient, *patria potestas*, support, guardianship, or personal servitude; that the action for such damages already pending in court showed the determination of the person to claim, as it did; that by virtue thereof she was owed something as susceptible of collection as if it were the product of her personal labor or of damages caused to her property, it being concluded, therefore, that such action did not die with the claimant, since "it is not a case of something so very personal as to require the natural existence of the person in order to continue the action."

*Hernández* v. *Fournier*, 80 P.R.R. 94, 97 (1957), affirms the fact that we have not decided whether the right of a person to assert a claim for compensation for injuries is transmissible to his heirs. See footnote (1), in which several commentators are cited who favor such transmissibility.

In *Robles* v. *Superior Court*, 85 P.R.R. 640, 647 (1962), we said that "The old and already outmoded principle that subrogation has no place in personal damages . . . corollary of the *discarded doctrine that the personal action is extinguished upon the death of the plaintiff has not been in force in our jurisdiction.*" (Italics ours.)

In *Compañía Trasatlántica Española, S.A.* v. *Meléndez Torres*, 358 F.2d 209, 214 (1st Cir. 1966), the award for damages to the children of an injured person who died, for his sufferings while he was still alive, is affirmed, although

reduced. In *Santa* v. *United States*, 252 F.Supp. 615 (1966), the Federal Court for the District of Puerto Rico concluded that the minor plaintiffs are entitled to recover, in their capacity as legitimate heirs of the deceased, for all the pain and sufferings of the latter.

It seems evident to us from the foregoing that we have not explicitly decided the question raised. However, it is clear, from the aforementioned cases, that if the injured person had filed his complaint for the damages sustained, his cause of action is not extinguished by his death, since this is not a very personal right like the usufruct, use, habitation, annuity, patria potestas, support, guardianship, or personal servitudes. And we add, if the right of action is not extinguished by his death, why should his heirs be denied compensation for the deceased's sufferings because of the fact that he died before he could institute his action? We are answered that under § 1802 of the Civil Code we can only grant compensation for damages sustained by the claimant. If this were true, claimants could only recover for their own damages, and could not continue the action which their predecessor had filed where he asserted the compensation for the moral damages sustained. What this means is that the right of action of the deceased victim is very personal, when already in *Robles* and in *P.R. Ry., Lt. & P. Co.*, *supra*, we decided otherwise.

In other words, if we have already decided that the heirs may recover their own damages as a result of their predecessor's death, and, also, the moral damages of the latter as they appear alleged in the complaint, which damages said predecessor could assert before he died, we do not see why the right to recover the moral damages sustained by their predecessor should be denied to them when the latter could not institute his action before he died because of a condition so serious that he died a few days after the accident.

4.—We are told that in Spain, only the right of the heirs to recover their own damages and not those suffered by the

predecessor has been acknowledged. We conclude the contrary. It its judgment of December 20, 1930, this right was denied for the reason that "the sudden death of the victim having occurred as a result of an accident, the latter did not possess, even for a moment, the right to compensation, so that, because of this fact, there arose a new action in favor of the persons who need not justify their capacity as heirs, but that as children and spouse of the deceased." The judgment of February 17, 1956, determined, as to the moral damage sustained by an injured person who died afterwards, that "the transmissibility of the action pertinent to the heirs still constitutes a problem in the case law doctrine . . . ."

Professor Luis Diez-Picazo, in his work *"Estudios sobre la Jurisprudencia Civil"* 671–672, states that according to the preceding ruling, the damage consisting in the loss of the victim's life is a compensable damage; that "It seems, although not clearly stated, that the action to claim compensation is incumbent on the heirs."

By the judgment of November 25, 1969, the complaint in a case for damages was dismissed as to the moral damages suffered by the injured person who died as a result of the accident, because the claimant failed to establish that she was an heir, or that she could represent the heirs of the deceased. It is evident that the court assumes that had the heirs claimed such damages, the complaint would have prospered. XXXVI Aranzadi, *Repertorio de Jurisprudencia* 3689 (1969).

Professor Federico de Castro y Bravo informs that the case law of the Supreme Court of Spain "is [on the matter discussed herein] in a decisive and crucial moment"; that "A considerable number of orders of the Civil Division and the doctrine of the Criminal Division deem that life is a property, whose loss originates an appraisable prejudice, for which the victim should be compensated, and, in default of the latter, his heirs or successors in interest. Some judgment of the Civil Division follows the contrary view. Contradiction which has

been solemnly set forth in the judgment of February 17, 1956 (184)." *La Indemnización por Causa de Muerte, Anuario de Derecho Civil* 449–504 (1956).

Borrell states that: "The law failing to forbid it, it is indubitable that the action for damages may be exercised by the heirs of that person who originally acquired it." Borrell, *Responsabilidades Derivadas de la Culpa Extracontractual* 262–264. Planiol and Ripert favor the transferability of such action. 6 *Tratado Práctico de Derecho Civil Francés* 896–897. Puig Brutau, in his work V-I *Fundamentos de Derecho Civil* 55, citing De Castro and the former decisions, states:

"s) *The predecessor's right to compensation for damages* caused to him during his life is transferable, naturally, to his heirs, since, definitively, it is a credit right perfectly transferable under the general rules governing the transferability of rights. But the case is different when *the obligation to compensate arises as a consequence of the death* caused to the predecessor. Under such assumption it is argued whether the persons sustaining damages acquire their own right to demand from the tort-feasor the compensation corresponding to the material and moral damage directly sustained, or whether, definitively, it is acquired by those who establish that they are the heirs of the victim. The consequences could be quite different in one and the other case, although in both cases it be considered that this is a right generally transmissible.

"The Spanish case law concerning this question has been carefully examined by Federico De Castro." (Italics in the original.)

5.—It is argued that the moral damages caused to the injured person who dies are speculative. They are not to a greater degree than when the injured person dies after having filed his complaint for the moral damages sustained, in which case we have held that the action does not extinguish, but rather that it is transferred and may be continued by his heirs. Although it is true that in this last case there are some allegations in the complaint made by the injured person him-

self with respect to his damages, it is not less true that such damages must be proved and that, therefore, in the case in which the injured person has filed his complaint before he dies, as well as in the case that the death takes place before the complaint is filed, the problem of proving his moral damages is identical. In both situations the reasonable value of said damages must be estimated on the basis of the nature and extent of the injury, the suffering it causes, and of the testimony of the witnesses who were beside the injured person until he died.

In the case at bar the evidence showed that appellants' predecessor had three-fourths of his body covered with burns; he could not wear any kind of clothing; he got to talk to his wife in the hospital, although he only lived three days. His wife testified that "His physical condition showed that he was suffering too much." The court may take judicial notice that every human being, conscious during three days and having burns covering three-fourths of his body, must suffer intense pain.

6.—This Court having held that the action filed by a person before he dies to recover damages for sufferings sustained, does not die with him, and, on the contrary, it is transferable to his heirs because this is not the case of a very personal right, we see no reason why the right to such compensation shall not be likewise transmissible, when the injured person dies before having filed the corresponding action to assert such right. If the act of asserting the right by judicial action in these cases is not very personal, similarly, the right to compensation which gives rise to such action is not either. We do not believe that, because of the fact that circumstances, such as the injured person's serious condition, his limited term of life after the accident, and the state of commotion which necessarily arises upon the occurrence of the tragedy, preclude or prevent the injured person from filing his action be-

fore he dies, they should preclude, in equity, the transference of such right to his heirs.

7.—We have been told that this conclusion is not in harmony with the doctrine we established in *Robles Ostolaza* v. *U.P.R.*, 96 P.R.R. 570, 580 (1968). We assume that this assertion is based on the fact that in said case we said that "it can be argued that the cause of action to recover damages for a personal injury is of a personal or very personal nature and that the compensation for personal injury is separate."

The scope of this remark in *Robles Ostolaza, supra*, must be determined within the ambit of the question decided in said case, that is, whether the cause of action for damages to the person of a wife is her separate right, or that of the conjugal partnership constituted by her and her husband. In qualifying said cause of action as personal in the said case, it must be understood that it is so to the effect of justifying that it is a private right of the person who suffers the damage, on the grounds set forth in the opinion in said case. The fact that we conclude now that the cause of action for the moral damages sustained by such person is not extinguished by his death, but rather, on the contrary, his heirs may claim such damages, is not in any manner whatsoever inconsistent or conflicting with the fact that such cause of action is the separate right of the person who suffered the damage. The subsistence of such cause of action in the heirs is rather a complementary doctrine, and in all its aspects in harmony with that in which the cause of action of a husband or wife for damages to his or her person is a separate right of the person who sustained them.

8.—Such action of the injured who died is provided by §§ 41 and 584 of the Code of Civil Procedure, still in force in Puerto Rico, and which read as follows:

"*If a person entitled to bring an action die* before the expiration of the term limited for the commencement thereof, and the cause of action survive, *an action may be commenced by his rep-*

*resentatives,* after the expiration of that time, and within one year from his death. If a person against whom an action may be brought die before the expiration of the time limited for the commencement thereof, an action may be commenced against his representatives after the expiration of that time, and within one year after the issuing of letters testamentary or of administration." (Italics ours.)

"It shall be the duty of the administrators and while they. are being appointed, of the executors, to represent the decedent in all legal proceedings begun by or against him before his death, *and in those which may be instituted afterwards by or against the inherited estate.* Actions or proceedings brought by or against the decedent shall be stayed by his death until the executor takes charge or an administrator is appointed; and the executor or administrator shall be substituted as a party in the action." (Italics ours.) (32 L.P.R.A. §§ 255 and 2471.)

We have determined the scope of said § 41 in several cases which we shall comment below.

An action having been filed for the recovery of part of the amount of a promissory note by the heir of the holder against the debtor's heir, this Court concluded, in *Rovira* v. *Oliver,* 70 P.R.R. 106 (1949), that the action was proper and that it had not prescribed since said § 41 "extends rather than restricts the statute when parties die before limitation expires."

In a complaint brought by an heiress of the profits derived from the funds deposited by her predecessor with the defendants and which the latter partly invested and partly appropriated for their own use, unjust enrichment was alleged in violation of a mandate. The cause of action for the return of such appropriated funds which, as falsely alleged, were paid as a commission, is comprised in § 1802 of the Civil Code. The term of one year is computed from the time plaintiff had knowledge of the facts. Section 41 of the Code of Civil Procedure cannot operate to shorten the term set for prescription. *McCormick* v. *González,* 49 P.R.R. 460, 463, 473, 475, 476 (1936).

In *Torres* v. *Heirs of Córdova*, 31 P.R.R. 849 (1923), a complaint for damages against the heirs whose predecessor caused the damages was sustained, the Court holding that the provision of the said § 41 does not favor the heirs, and is another argument in favor of appellant.

In *Rivera* v. *Viejo*, 49 P.R.R. 884 (1936), it was held that the word "representatives" in § 41 includes those persons really interested, who are the heirs and the judicial administrator, if there is one.[1]

The survival of said action of the injured person who dies before filing the complaint is in harmony with the pertinent provisions concerning succession. Sections 559–602 of the Civil Code (31 L.P.R.A. §§ 2081–2084).[2]

After a careful examination of the state of law on this question, our colleague García Martínez, in his monography entitled *"Reconocimiento de la Acción Hereditaria por Muerte Ilegal,"* 27 Rev. C. Abo. P.R. 463, 476 (1966–67), states that:

"3.—The acknowledgment of the existence of said action and of its transferability is a measure of justice, insofar as it per-

---

[1] Said § 41 was taken from § 353 of the Code of Civil Procedure of California.

In that jurisdiction the case of the survival of the action for personal damages not filed while the injured was alive has not been considered. The few cases decided deal with the survival of the action for the recovery of real property or of the possession of real property. *Harris* v. *McGovern*, 99 U.S. 161 (1879); *Hennessy* v. *Title Ins. & Trust Co.*, 228 P. 714 (D.C.A. Cal. 1924). In a case of damages caused by the negligent act of an attorney, it was held that action could be brought against the latter's "estate." It was also said that the action for services rendered to a person who died before the action was filed survives his death. *Fazio* v. *Hayburst*, 55 Cal. Rptr. 370 (D.C.A. Cal. 1967); *Vonchina* v. *Turner's Estate*, 315 P.2d 723 (D.C.A. Cal. 1957).

[2] These provisions were taken from the Civil Code of Louisiana (§§ 871–874 of said Code). In that jurisdiction it has been held that the right of action in a donor to attack the donation is a heritable right of action. Similarly, the action grounded on the obligation arising out of a contract to run a horse is hereditable. *Castleman* v. *Smith*, 86 So. 778 (La. 1920); *Grayson* v. *Whatley*, 15 La. Ann. 525 (1860).

mits the recovery of damages when the injury produces the maximum damage, which is death.

"4.—The acknowledgment of the action of the primary victim and of its transferability to the heirs is not, in any manner whatsoever, in conflict with, but, on the contrary, complements the very action of those who, *being or not being heirs,* are prejudiced by the death of the primary victim.

"5.—The acknowledgment of the action of the primary victim and of its transferability is in harmony with the civil principle of universal succession to the rights and obligations of the predecessor accepting as fundamental premise that this is a transferable personal right and not an untransferable not very personal right.

"6.—The acknowledgment of the action of the primary victim and of its transferability would be the rubric of the definitive rejection of the archaic and unfair doctrine that personal actions die with the person."

In view of the foregoing, I believe that we should acknowledge the right of the heirs to recover for the moral damages sustained by their predecessor, damages which I estimate in the amount of $10,000.