INOCENCIA FIGUEROA VDA. DE DELGADO ET AL., demandantes y recurrentes, *v.* BOSTON INSURANCE COMPANY, demandada y recurrida.

*Número:* R-68-234        *Resuelto:* 11 de marzo de 1971

716

*Amadeo & Benet* y *Rodolfo Gluck,* abogados de los recurrentes; *Castro & Castro,* abogados de la recurrida.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Contrario a lo resuelto por el tribunal de instancia, concluimos que bajo las circunstancias de este caso, el dueño de una lancha de motor es responsable por la muerte de un ebanista a quien empleó para ayudarle a cambiar los motores de gasolina de la lancha por motores diesel, muerte que sobrevino al ocurrir una explosión en el lugar a donde el difunto fue, por órdenes del dueño, a taladrar unas perforaciones en los tanques de combustible. Procede, por lo tanto, condenar a los recurridos a pagar los daños sufridos por los recurrentes, según se determina más adelante.

La prueba con respecto a las circunstancias del accidente consistió del testimonio de Wilfredo Beltrán el dueño de la lancha de motor llamada "Contigo" y el de un perito en trabajos en tanques de gasolina. En 4 de febrero de 1966 ocurrió una explosión en uno de los tanques de gasolina de dicha lancha con motivo de lo cual se quemaron Ramón Delgado y Beltrán y se quemaron la lancha "Contigo" y otra más. Delgado murió a consecuencias de las quemaduras. Era ebanista. Beltrán lo empleó para que lo ayudara a "remoldear" la lancha y a montar un motor. Durante los tres días antes del accidente, Beltrán y Delgado trabajaron "poniendo un flange . . . ." en los tanques de gasolina "para hacer una conexión de tubería a los motores diesel que se iban a instalar en la lancha." Esos *flanges* son dos "planchuelas" de bronce, una con rosca y otra sin rosca "para cogerlo con una junta donde va enroscado un tubo para de ahí seguir al motor . . . y se pone justo para que no se salga el líquido que sea." Beltrán sabía cómo realizar la operación. Terminaron de colocar los *flanges* en la parte de arriba de los tanques. Faltaban los últimos dos en la parte baja de los tanques, a pulgada y media o dos pulgadas del fondo de los tanques. Para hacer esto, por instrucciones de Beltrán, Delgado iba a barrenar unas perforaciones que faltaban. Beltrán estaba haciendo la misma operación en el tanque de agua cuando ocurrió la explosión. Beltrán vio a Delgado por

última vez antes de la explosión "preparándose para seguir haciendo ese trabajo." Dijo que cuando ocurrió la explosión supuso que Delgado estaba taladrando pero en ese momento "no lo estaba mirando taladrando, él podía estar usando una sierra . . . pero yo creo que no"; que presume que habían gases cuando ocurrió la explosión. Al ocurrir la explosión Beltrán testificó que "me quedé atontado un rato. Cuando desperté tenía el piso de la lancha encima, entonces pues ya había cogido bastante fuego la lancha, entonces, Ramón Delgado estaba donde mismo estaba trabajando, estaba atontado, y no podía 'menearme' y salimos los dos prendidos en candela." La barrena o taladro eléctrico estaba al lado de Delgado. Este estaba trabajando en la popa de la lancha en el hueco donde estaban situados los tanques de combustibles debajo del piso, los que eran de cinco pies de largo, tres de ancho y catorce pulgadas de alto con capacidad para 150 galones, cada uno. Preguntado Beltrán sobre la causa del accidente dijo que "lo que creo es que Ramón Delgado estaba con el taladro, yo no lo vi, perforando los huecos en el tanque, entonces, pues aparentemente los gases que habían dentro del tanque al barreno calentarse hubo la explosión, entonces, de la explosión vino el fuego, porque es material de 'fiberglass', y eso cuando coge fuego, es como el acetileno cuando coge fuego no hay quien lo apague." No tomó otras precauciones para cerciorarse que no habían vapores de gasolina en el tanque. Dijo que "Lo olía pero no olía a nada" el día antes de la explosión. Beltrán había regalado con anterioridad al accidente el "sniffer" de la lancha, aparato usado para medir la densidad de los vapores de gasolina. No sabía que era una precaución normal mantener los tanques de combustible llenos de agua cuando se trabaja en la lancha para evitar explosiones ni hizo diligencia alguna para enterarse de esto pues unos mecánicos "me vieron trabajando y no me dijeron nada yo seguí para adelante." El no les preguntó. Beltrán había poseído botes de motor antes y conocía lo que es y el

uso del taladro por veinte años. Dijo que durante su uso se calienta al rojo vivo lo suficiente para quemar y para prender vapor. Dijo no saber esto cuando el accidente. Repitió que el fuego comenzó en el tanque y siguió caminando "porque el fiberglass [material del tanque] se va rápido." Testificó que sabía que la gasolina se convierte en gases "pero no sabía que iba a pasar eso" (la explosión); que Delgado no sabía nada de bregar con tanques de gasolina; que en la lancha no había algo que produjera la explosión fuera del tanque de gasolina; que "No puede haber nada más." Delgado no fumaba. No se cocinaba en la lancha cuando ocurrió la explosión ni había otra persona allí entonces.

Se admitió en evidencia la póliza emitida por la recurrida la cual provee un seguro hasta $300,000 por pérdida de vida, lesiones y daños a la propiedad.

El perito Luis Hernández Bonet testificó que "Cuando se va a reparar un tanque de gasolina lo primero que hay que hacer es trabajar en un sistema de ventilación, que haya ventilación, lo segundo es estar bien seguro que no hayan vapores, o sea, los gases explosivos, hay varias formas de probar esto, bien sea con instrumento, ya sea por el olfato. Para tomar las precauciones debidas lo más importante es lavar el tanque por lo menos dos o tres veces y cuando se va a trabajar en el tanque tenerlo lleno de agua con los 'plots' abiertos"; que si no se toman esas precauciones puede ocurrir una explosión en más del 70% de los casos; que uno se percata de los gases por el olfato; que por lo regular los gases se quedan en la parte más baja de la lancha; si no se perciben los gases se puede trabajar "siempre y cuando se tomen las precauciones"; que no "todo hijo de vecino" sabe que esas precauciones hay que tomarlas.

El juez de instancia, al desestimar la demanda, concluyó que:

(1) "No hubo prueba sobre cuál fue la causa de la explosión, salvo conjeturas y suposiciones. Tampoco hubo prueba sobre los

actos que estaba realizando el difunto cuando ocurrió la explosión en el cuarto de los tanques de gasolina. La última vez que se vio al difunto fue en la cubierta de la lancha cinco minutos antes de la explosión.

(2) "El asegurado y el difunto tomaron las medidas de seguridad que una persona prudente y ordinaria hubiera tomado en similares circunstancias.

(3) "No hay hechos probados . . . de los cuales podamos inferir la presunción de que la explosión y el fuego fueron causados por actos o instrumentalidades por las cuales el asegurado es responsable; que no se puede inferir que cuando ocurrió la explosión el difunto estaba taladrando uno de los tanques y que el taladro se calentó o produjo una chispa y por ello se prendieron los gases en los tanques que ocasionaron la explosión; que no es aplicable la doctrina de res ipsa loquitur pues el accidente ocurrió en un sitio no bajo el exclusivo control del asegurado."

Apuntan los recurrentes, en síntesis, que el tribunal de instancia incidió en la apreciación de la prueba, al concluir que Beltrán no fue negligente.

A los fines de resolver debemos determinar, de ser posible, primero, dónde se originó la explosión y cuál fue su causa; segundo, si el dueño de la lancha fue negligente en este caso y si esa negligencia fue la causa próxima del accidente; y tercero, si el difunto fue negligente y en qué grado.

Del anterior resumen del testimonio oral relativo al accidente, se han establecido los siguientes hechos:

(1) Beltrán, dueño de la lancha, controlaba, dirigía y participaba en la operación de arreglar los tanques de combustible de dicha lancha.

(2) Delgado era un ebanista empleado por Beltrán para ayudarle en la faena previamente mencionada. No sabía cómo bregar con tanques de gasolina.

(3) Beltrán (a) había usado el taladro eléctrico durante veinte años; (b) sabía que hay gases en los tanques de gasolina, circunstancia de peligrosidad; que para evitarlos deja-

ron abiertos unos huecos, drenaron los tanques y los secaron con un palo y un trapo; (c) que el día antes del accidente olió el tanque pero "no olía a nada"; (d) no conocía de ningunas otras precauciones que hubiese que tomar; que no indagó si las habían y cuáles eran.

(4) Momentos antes de la explosión Beltrán ordenó a Delgado taladrar unos huecos, para los últimos *flanges*, bien al fondo del tanque. Lo vio por última vez antes de la explosión cuando se disponía a hacerlo.

(5) Beltrán descartó por inexistente toda otra posible causa de la explosión que no fuera el taladro del tanque.

(6) La posible explicación de por qué el tanque no explotó cuando se taladró por arriba y sí pudo explotar cuando se hizo el taladro muy cerca de su fondo, es que los gases de gasolina tienden a descender a la parte más baja del lugar en que se encuentran.

Relacionamos a continuación las normas de derecho aplicables al caso ante nos.

■ 1.—En *Vda. de López v. García Espinosa*, 86 D.P.R. 702, 707 (1962), dijimos que cuando este Tribunal ha ejercido su discreción en el sentido de elevar ante sí una causa para revisarla, la revisión cubre las conclusiones de hecho con sujeción a ciertas normas aplicables.

■ 2.—En *Rodríguez v. Ponce Cement Corp.*, 98 D.P.R. 201 (1969), dijimos que no obstante corresponder la carga de la prueba a la parte actora, no se le exige aquel grado de prueba que, excluyendo la posibilidad de error, produce certeza absoluta; que "Explicada satisfactoriamente la falta de evidencia directa por ausencia de testigos . . . y por incompetencia del demandante como consecuencia del accidente mismo podía descargarse esta responsabilidad mediante la presentación de prueba indirecta, en este caso, inferencias. Todo cuanto se requería era la presentación de prueba a cuya luz una persona razonable pueda

quedar convencida de que el acto general de la responsabilidad es atribuible a la parte demandada."

En *Murcelo* v. *H. I. Hettinger & Co.*, 92 D.P.R. 411, 426 (1965), dijimos que ". . . El litigante puede probar su caso con evidencia indirecta, que es de dos clases, inferencias y presunciones. Es inferencia, la deducción que de los hechos probados, o acreditados completamente, hace en su discernimiento el juzgador. A veces se denomina presunción *hominis*. Representa ese discernimiento una actividad humana valorativa de comparación o confrontación, un proceso interno que constituye, a juicio del profesor Serra Domínguez, algo inabordable; el movimiento de la razón yacente en el hombre."

En *Renfro* v. *J. D. Coggins Company*, 378 P.2d 130 (N.Mex. 1963), se resolvió que un demandante no tiene que probar negligencia más allá de duda razonable pero las circunstancias reveladas por la prueba deben ser lo suficientemente fuertes de manera que el tribunal de instancia pueda, tomando en consideración las probabilidades existentes en el caso, excluir inferencias favorables al demandado. No es suficiente que la negligencia imputada pudiera justa y razonablemente haber causado la lesión si las circunstancias demuestran una probabilidad igual de que se debió a otra causa. *Grange* v. *Finlay*, 364 P.2d 234 (Wash. 1961); *Lindgren* v. *Voge*, 109 N.W.2d 754, 760 (Minn. 1961).

3.—Es de conocimiento general que la gasolina produce vapores que por ser más pesados que el aire, tienden a bajar al fondo del receptáculo o lugar en que se encuentra y que ambos son altamente explosivos e inflamables. La persona que tiene el dominio o derecho del dominio del lugar u operación en que existen las anteriores circunstancias está en el deber de advertir del peligro existente así como de las precauciones que se deben tomar a aquellas que, por invitación suya, se encuentran en dicho lugar. Dicha persona debe

ejercer el mayor cuidado y tomar todas las precauciones que conoce o debió conocer para evitar tal peligro. *Moore* v. *Beard Laney Inc.*, 139 S.E.2d 879 (N.C. 1965); *Mathis* v. *Lukens Steel Co.*, 203 A.2d 482 (Pa. 1964); *Taormina Corporation* v. *Escobedo*, 254 F.2d 171, 174 (5th Cir. 1958); *Wichita City Lines* v. *Puckett*, 295 S.W.2d 894 (Texas 1956); *Dean* v. *Coombs Motor Co.*, 97 N.E.2d 531 (Mass. 1951); *Gunnarson* v. *Robert Jacob Inc.*, 94 F.2d 170, 172 (2d Cir. 1938); *Nelson* v. *Zamboni*, 204 N.W. 943 (Minn. 1925); *Carpenter* v. *Sinclair Refining Co.*, 129 N.E. 383 (Mass. 1921). Véase, además, la monografía titulada "Botes de Motor—Responsabilidad por Daños en Caso de Explosiones y Fuego", 63 A.L.R.2d 343, 389–390.

4.—La negligencia debe establecerse por prueba o por inferencia de los hechos establecidos. Puede quedar establecida cuando la prueba permite a personas de mente razonable concluir que la mayor probabilidad es de que el fuego ocurrió en una forma que responsabiliza a una persona como su causante, en lugar de que ocurrió en forma tal que dicha persona no sería su causante. Al considerar la evidencia circunstancial aducida para probar un hecho, el juzgador debe reconocer la distinción existente entre aquella que es una mera conjetura y la que es una inferencia razonable. *Wolverine Upholstery Company* v. *Ammerman*, 135 N.W.2d 572, 579 (Mich. 1965); *Chaloupka* v. *Cyr*, 387 P.2d 740, 745 (Wash. 1964).

5.—El requisito de que el demandante pruebe hechos de los cuales se pueda razonablemente inferir la negligencia del demandado, no quiere decir que deba eliminarse toda posibilidad de causas distintas de la que se alega. Debe establecerse, sin embargo, que la posibilidad de tales otras causas queda tan reducida que la mayor posibilidad es que la negligencia del demandado fue la causa próxima del accidente. Aunque se requiere una inferencia razonable de que

la negligencia del demandado fue la causa próxima del accidente, no es necesario que se pruebe con exactitud matemática que el accidente se debió a una causa con exclusión de todas las demás probabilidades, pero debe demostrarse que ninguna de éstas, en el caso de ser justamente sugeridas por la prueba, fue la causa. Dicho en otra forma, no es necesario que el demandante excluya toda probabilidad de que su lesión fue ocasionada por la negligencia de otras personas aparte del demandado. Por parte del demandado no es suficiente hacer mera referencia a otras posibles causas de un fuego de las que el demandado no es responsable y que pudieron ocasionar el daño. Causas posibles o probables no quiere decir conjeturas o especulaciones sobre posibles causas. La prueba de una causa suficiente de un accidente junto con circunstancias que fuertemente indican que es la verdadera causa, sólo puede ser rebatida mediante otra prueba de que la muerte o lesión fue ocasionada por otra causa. Dijimos en *Rodríguez* v. *Ponce Cement Corp.*, supra, que el hecho de que un accidente pudiere obedecer a otras causas no es suficiente por sí solo para derrotar una reclamación. Sólo es necesario que el tribunal estime que la acción u omisión indicada por el actor fue la que con mayores probabilidades causó el accidente. *Kuster* v. *Gould National Batteries, Inc.*, 429 P.2d 220 (Wash. 1967); *Parlow* v. *Dan Hamn Drayage Co.*, 391 S.W.2d 315 (Mo. 1965); *Cuthbert* v. *City of Philadelphia*, 209 A.2d 261 (Pa. 1965); *Sommer* v. *Yakima Motor Coach Co.*, 26 P.2d 92 (Wash. 1933).

Aplicando las anteriores normas se responsabilizó (1) en *Kuster*, supra, al manufacturero de un acumulador por las lesiones que recibió un mecánico al conectar el acumulador a otro que estaba descargado; (2) en *Grange*, supra, al dueño de un yate por los daños al muelle donde atracó una tarde, ocasionados por fuego a media noche, indicándose que durante la travesía antes de atracar, dicho dueño había apagado fuego a bordo en repetidas ocasiones y no removió de

la cabina una colchoneta que se había incendiado y a la cual echó agua en varias ocasiones; (3) en *Dean*, supra, al dueño de un taller de reparaciones, por la destrucción de un camión por fuego cuando luego de levantarlo de atrás para reponer unas sopandas, se procedió a quemar unos remaches con una antorcha de acetileno, concluyendo el tribunal que chispas incandescentes diseminadas por la antorcha incendiaron la gasolina que se debió regar del tanque situado en el centro del camión al inclinarse éste en un ángulo de 30 grados; (4) en *Gunnarson*, supra, al dueño de un yate por lesiones ocasionadas al capitán debido a una explosión cuando éste accidentalmente cortó una rosca de cobre en el cuello de un tanque de gas propeno en el curso de instalar otro con motivo de lo cual ocurrió un escape de gas, concluyendo el tribunal, por voz del Juez Learned Hand que "La probabilidad de que alguien fuese descuidado al hacer la instalación no era imposible. Por el contrario, era muy probable en ausencia de ser prevenido y era un peligro en contra del cual se debió tomar alguna providencia. Era esencial, por lo tanto, que se hubiera instruido a Gunnarson que bajo ninguna circunstancia debía permitir el corte de la rosca y que se hiciese obedecer tal orden hasta donde fuese razonablemente posible"; (5) en *Sommer* v. *Yakima Motor Coach Co.*, supra, al dueño de una diligencia de motor en la que se apagó un fuego en varias ocasiones durante su travesía, por la destrucción por fuego del edificio en que se estacionó.

En *Nelson*, supra, un cliente de una estación de gasolina murió con motivo de una explosión ocurrida en la estación de cuya causa no se adujo prueba. Desestimada la demanda por daños por dicha muerte y dictada orden denegando una moción de nuevo juicio, se revocó dicha orden al concluirse que la doctrina de *res ipsa loquitur* aplicaba al caso pues el accidente era del tipo que corrientemente no ocurría si los que estaban en el dominio de la instrumentalidad hubiesen usado el grado de cuidado requerido por el peligro ya que

es bien conocida la tendencia de la gasolina a vaporizar y así producir material para una explosión violenta, tendencia que puede controlarse ejerciendo el debido cuidado.

En el caso ante nos la operación de taladrar el tanque de gasolina era de suma peligrosidad debido a la naturaleza explosiva de este combustible y de los gases que genera, residuos de los cuales permanecen, como es sabido generalmente por dueños y operadores de botes y lanchas de motor, no tan sólo en el fondo de tanques cuando éstos se drenan, sino también en el lugar debajo del piso donde están situados los tanques. También es conocido que la precaución más efectiva para evitar una explosión al procederse a taladrar un tanque de gasolina, además de removerlo del lugar donde se encuentra, es mantenerlo totalmente lleno de agua. El dueño del yate en este caso, y bajo cuyo dominio y dirección se realizaba el cambio de motores y las modificaciones en los tanques, debió conocer y cerciorarse de estas precauciones y asegurarse que no se realizase taladro alguno hasta que se cumpliese con las mismas. No sólo fue negligente al no tomarlas sino que también lo fue al no advertirle a Delgado del peligro existente ya que éste obviamente desconocía el mismo pues era un ebanista empleado por el dueño para ayudarle en la faena en cuestión.

Aunque no se comprobó con absoluta certeza cuál fue la causa de la explosión y el incendio de la embarcación, el propio dueño admitió que distintas causas no ocasionaron el accidente, quedando como posible causa el taladro de uno de los tanques por Delgado. La inferencia de que ésta fue la causa inmediata de la explosión está sostenida por la prueba. Momentos antes del accidente, el recurrido había ordenado a Delgado que procediese a taladrar la parte baja del tanque casi al fondo del mismo y lo vio por última vez con anterioridad al suceso "preparándose para seguir haciendo ese trabajo." Luego de la explosión apareció el taladro en el lugar de la explosión. Días antes se había drenado del

tanque la gasolina contenida en el mismo y se había procedido a secar el interior del tanque con un trapo. Esta operación no podía evitar que residuos de los gases permanecieran en el fondo del tanque y, además, en el fondo del limitado lugar donde estaban los tanques debajo del piso de la cubierta en la popa del yate. Precisamente porque estos gases tienen la tendencia a permanecer al fondo del tanque y del referido lugar es que al hacerse perforaciones en la parte superior del tanque no ocurrió explosión o fuego alguno. Pero cuando Delgado procedió a taladrar cerca del fondo del tanque con un taladro eléctrico, es inferible que una de las dos cosas ocurrieron, o los gases al fondo del lugar vinieron en contacto con el taladro candente al rojo vivo, o con una chispa producida por el mismo; o los gases en el fondo del tanque vinieron en contacto con el calor excesivo del taladro. Cualquiera de estas situaciones pudo ocasionar la explosión y el fuego. El recurrido anticipó estos peligros pero fue negligente en no tomar las referidas precauciones. Era su obligación conocerlas, cerciorarse de ellas y tomarlas, así como advertir al difunto del peligro envuelto en las operaciones e instruirle sobre las referidas precauciones y asegurarse que las tomara y las siguiera. Por lo tanto, concluimos que debe responsabilizarse a la aseguradora del dueño del yate por los daños ocasionados por la referida explosión inclusive los resultantes con motivo de la muerte del artesano en cuestión.

Veamos ahora cuáles fueron los daños ocasionados con motivo de la muerte del referido obrero.

Procede considerar como elemento de daño el lucro cesante. De acuerdo con la prueba aducida, Delgado era un artesano que gozaba de un ingreso semanal de $100.00. Murió a los 48 años de edad de manera que tenía una expectativa útil de vida de 17 años. Las reglas para determinar la cuantía de tales daños en un caso como éste, están expuestas en *Rodríguez* v. *Ponce Cement Corp.*, supra, y en *Vda. de Seraballs* v. *Abella Hernández,* 90 D.P.R. 368 (1964). Es

necesario aclarar que los daños por lucro cesante no se deben determinar exclusivamente a base de la ecuación matemática a que se ha hecho referencia en los anteriores casos. La misma es sólo uno de los factores, en adición a todas las circunstancias del caso que se puede tomar en consideración, a los fines de determinar la razonabilidad de la cuantía en que se estima la pérdida por el lucro cesante. A esos fines, debe aducirse la prueba que hubiere sobre el estado de salud del fenecido antes del accidente y el promedio del ingreso derivado de su trabajo durante algunos años antes del suceso que ocasionó su muerte. Consideradas todas las circunstancias del caso, concluimos que el justo valor actual del lucro cesante es la suma de $30,000.00, de los cuales $14,000 corresponden a la viuda, $4,300 a cada uno de los hijos menores y $3,100 a la hija mayor.

Por las angustias mentales sufridas por la viuda del Sr. Delgado al contemplar su horrendo sufrimiento producido por las extensas quemaduras en tres cuartas partes del cuerpo que a los tres días de recibidas le causaron la muerte, y al verse privada de su compañía, debe concederse la suma de $20,000.00 como compensación justa y razonable por unos daños que en realidad son irreparables.

Por los daños sufridos por los tres hijos menores, al ser privados de la compañía, cariño y de la dirección de su padre en la formación emocional y espiritual de ellos, en la temprana edad que es cuando más lo necesitaban, concluimos que procede conceder la suma de $10,000.00 a cada uno. Los de la hija mayor, producto de un matrimonio anterior, los determinamos en la suma de $5,000.00, ya que ésta era viuda que volvió a vivir en casa de su padre sólo dos años con anterioridad al accidente. *Jordán* v. *Sindicato Empleados*, 95 D.P.R. 681, 687 (1968).

Procede también que se condene a la recurrida a pagar los gastos de hospitalización y del funeral del difunto ascendentes a $1,217.60.

■ En vista de que el tribunal se ha dividido con respecto a la procedencia de la acción de daños de los herederos por los sufrimientos de su causante el Sr. Delgado durante los tres días de su agonía hasta que murió a causa de las extensas y graves quemaduras que le ocasionó la explosión y el incendio en la lancha, el tribunal no se pronuncia en esta oportunidad sobre la referida cuestión.

El Juez Asociado Señor Ramírez Bages emitió opinión explicativa con la cual concurren los Jueces Asociados Señores Hernández Matos y Rigau. El Juez Asociado Señor Martínez Muñoz no intervino.

—O—

Opinión explicativa del Juez Asociado Señor Ramírez Bages con la cual concurren los Jueces Asociados Señores Hernández Matos y Rigau.

San Juan, Puerto Rico, a 11 de marzo de 1971

Lamento que el tribunal no haya podido pronunciarse sobre la procedencia de la acción de los herederos de una persona lesionada en un accidente y que muere sin haber radicado demanda por los daños morales que sufrió, por los referidos daños.

En el caso que nos ocupa, los recurrentes comprobaron ser los herederos del obrero que murió a causa de las quemaduras que sufrió al incendiarse la lancha. A esos efectos presentaron en evidencia copia certificada de la resolución del tribunal en el correspondiente procedimiento sobre declaratoria de herederos. En la demanda en este caso incluyeron en su reclamación "el valor del sufrimiento físico y mental del Sr. Delgado antes de morir", y en el recurso ante nos apuntaron como error del tribunal de instancia el habérselo negado.

Se aducen varios argumentos en apoyo de negar este tipo de reclamación. A mi juicio carecen de validez. Pasamos a analizarlos.

1.—Se arguye que no se sabe si el fallecido hubiera resuelto reclamar judicialmente los referidos daños. En vista de que la recurrida es la aseguradora del patrono causante del accidente en cuestión, debemos presumir que de haber vivido, el obrero se hubiera unido a la demanda radicada por sus herederos en reclamación de los daños sufridos por todos y cada uno de ellos. No existe impedimento legal alguno que evite hacer tal presunción basada en la realidad prevaleciente en nuestra comunidad al efecto de que cuando ocurren accidentes como el de este caso todas las personas lesionadas invariablemente reclaman el valor de los daños que sufren.

2.—Que no es necesario proveer específicamente para el recobro de tales daños pues al justipreciar los sufridos por los herederos, los tribunales toman en consideración los que sufrió el fenecido. Este argumento es especioso. Nada encontramos en derecho que justifique esta conclusión. Es posible que algunos jueces inconscientemente estimen los daños sufridos por los herederos en una cantidad mayor debido a los que sufrió su causante. Pero esta reacción aislada de los jueces no constituye un derecho. Por el contrario al ahora determinar el tribunal que no se pueden reclamar los daños del causante que éste no reclamó en vida, indudablemente se desarrollará una tendencia en sentido contrario en los jueces al estimar los daños de los herederos, reduciéndolos, ya que como cuestión de derecho no deben tomar en consideración los de tal causante.

Obviamente éste no es un argumento basado en algún principio o doctrina jurídica sino en una alegada reacción o actitud que puede tener algún viso de realidad en algunos jueces. No creemos que es justo dictaminar sobre la proce-

dencia de un derecho a base de un argumento tan especulativo como éste.

3.—Que el derecho en esta jurisdicción más bien es contrario al reconocimiento de tal derecho pues en *Travieso* v. *Del Toro y Travieso, Int.*, 74 D.P.R. 1009, 1015, 1016 (1953), dijimos que "la causa de acción por muerte no es parte del patrimonio del causante y no se transmite en virtud de las reglas referentes a la sucesión hereditaria. . . . No se ha operado sucesión alguna de la causa de acción por muerte ya que ella era personalísima del causante y se extinguió con su muerte." Este es un *obiter dictum* pues en *Travieso*, supra, lo que se resolvió fue que la acción del padre por la muerte de su hijo no provenía de su carácter de heredero sino de lo dispuesto en el Art. 1802 del Código Civil (31 L.P.R.A. sec. 5141). En este caso el padre no trató de recobrar por los sufrimientos ocasionados al hijo fenecido.

En *Porto Rico Railway Light & Power Co.* v. *Corte de Distrito*, 38 D.P.R. 340, 349 (1928), dijimos que no puede equipararse el derecho de reclamar daños y perjuicios por lesiones sufridas por una persona a virtud de la culpa o negligencia de otra ya ejercitado en corte y trabada la contienda, al usufructo, al uso, a la habitación, a la renta vitalicia que estuviera disfrutando el finado, a la patria potestad, a los alimentos, a la tutela o a las servidumbres personales; que la acción por tales daños pendiente ya en el tribunal demostraba la decidida voluntad de la persona de reclamar como reclamó; que en tal virtud se le debía algo tan susceptible de cobro como si se tratara del producto de su trabajo personal o daños a su propiedad, concluyéndose, por lo tanto, que tal acción no moría con el reclamante pues "No se trata de algo que sea personalísimo que necesite de la vida natural de la persona para continuar ejerciéndose."

*Hernández* v. *Fournier*, 80 D.P.R. 93, 97 (1957), confirma el hecho que no hemos resuelto si el derecho de una persona de exigir indemnización por lesiones es transmisible

a sus herederos. Véase su inciso (1) en que se citan varios tratadistas que favorecen tal transmisibilidad.

En *Robles Menéndez* v. *Tribunal Superior*, 85 D.P.R. 665, 672 (1962), dijimos que "El antiguo y ya casi desechado principio de que en los daños personales no tiene lugar la subrogación . . . colorario de la *descartada doctrina de que la acción personal se extingue al morir su titular no ha tenido entre nosotros vigencia.*" (Énfasis nuestro.)

En *Compania Trasatlantica Espanola, S.A.* v. *Melendez Torres*, 358 F.2d 209, 214 (1st Cir. 1966), se confirma, aunque se reduce, la concesión de daños a los hijos de un lesionado fenecido por el sufrimiento de éste mientras estuvo vivo el lesionado. En *Santa* v. *United States*, 252 F.Supp. 615 (1966), el Tribunal Federal de Distrito para Puerto Rico concluyó que los menores demandantes tienen derecho a recobrar, en su carácter de herederos legítimos del fenecido, por todo el dolor y sufrimiento de éste.

Nos parece evidente de lo expuesto que no hemos resuelto explícitamente la cuestión planteada. Resulta claro de los referidos casos, sin embargo, que si el lesionado llegó a radicar su demanda por los daños que sufrió, su causa de acción no se extingue por su muerte, pues no se trata de un derecho personalísimo como lo son el usufructo, el uso, la habitación, la renta vitalicia, la patria potestad, los alimentos, la tutela o las servidumbres personales. Y añadimos nosotros, ¿Si el derecho a reclamar no se extingue con su muerte, por qué ha de negarse a sus herederos el valor atribuible a los sufrimientos del fenecido por el hecho de que murió antes de poder radicar su acción? Se nos contesta que bajo el Art. 1802 del Código Civil sólo podemos dar compensación por los daños sufridos por el reclamante. De ser esto cierto los reclamantes sólo podrían recobrar sus propios daños, y no podrían continuar la acción que dejó radicada su causante en la que reclamó el valor de los daños morales que sufrió.

Lo que esto quiere decir es que el derecho de acción de la víctima fenecida es personalísimo cuando ya en *Robles Menéndez* y en *Porto Rico Railway Light & Power Co.*, supra, resolvimos lo contrario.

En otras palabras, si ya hemos resuelto que los herederos pueden recobrar sus propios daños con motivo de la muerte de su causante y, además, los daños morales de éste según aparecen alegados en la demanda por los mismos que dicho causante pudo radicar antes de morir, no vemos porqué deba negárseles el derecho a recobrar los daños morales sufridos por su causante cuando éste no pudo radicar su acción antes de morir debido a su gravedad de tal magnitud que murió a los pocos días del accidente.

4.—Se nos dice que en España sólo se ha reconocido el derecho de los herederos a recobrar sus propios daños y no los sufridos por el causante. Concluimos lo contrario. En su sentencia de 20 de diciembre de 1930 se negó este derecho por la razón de que "sobrevenida instantáneamente la muerte de la víctima de un accidente no llegó ésta a poseer ni en un momento el derecho a ser indemnizada, de suerte que por este hecho nació una nueva acción a favor de quienes no tienen necesidad de justificar su carácter de herederos, sino el de hijos y cónyuge del difunto." La sentencia de 17 de febrero de 1956 determinó que en cuanto al daño moral sufrido por una persona lesionada que luego falleció, "sigue constituyendo aun en la doctrina de la jurisprudencia un problema, el de la transmisibilidad de la acción competente a los herederos. . . ."

El catedrático Luis Diez-Picazo en su obra "Estudios sobre la Jurisprudencia Civil", págs. 671–672, nos dice que de acuerdo con el anterior dictamen, el daño consistente en la pérdida de la vida de la víctima es un daño indemnizable; que "Parece, aunque no se dice claramente, que la acción para exigir la indemnización compete a los herederos."

Por la sentencia de 25 de noviembre de 1969 se desestimó la demanda en un caso de daños y perjuicios en cuanto a los daños morales sufridos por el lesionado quien murió a consecuencia del accidente, porque la reclamante no estableció ser heredera ni poder representar a los herederos del fallecido. Es evidente que el tribunal asume que de haber reclamado los herederos por tales daños la demanda hubiese prosperado. Aranzadi, *Repertorio de Jurisprudencia*, (1969) tomo XXXVI, pág. 3689.

El catedrático Federico de Castro y Bravo informa que la jurisprudencia del Tribunal Supremo de España "está [sobre la materia aquí tratada] en un momento decisivo o crucial"; que "Una masa considerable de resoluciones de la Sala de lo Civil y la doctrina de la Sala de lo Penal estiman que la vida es un bien, cuya pérdida origina un perjuicio valorable, del que debe indemnizarse a la víctima y, a falta de ella, a sus sucesores o derechohabientes. Alguna sentencia de la Sala de lo Civil sigue el criterio contrario. Contradicción que ha señalado de modo solemne la sentencia de 17 de febrero de 1956 (184)." *La Indemnización por Causa de Muerte*, Anuario de Derecho Civil, 1956, págs. 449–504.

Borrell nos dice que "No prohibiéndolo la ley, es indudable que la acción de indemnización por daños y perjuicios la pueden ejercitar los herederos de aquél que la adquirió en un principio." Borrell, *Responsabilidades Derivadas de la Culpa Extracontractual*, págs. 262–264. Planiol y Ripert favorecen la transmisibilidad de tal acción. *Tratado Práctico de Derecho Civil Francés*, Vol. 6, págs. 896–897. Puig Brutau en su obra *Fundamentos De Derecho Civil*, Tomo V, Volumen 1, pág. 55 citando a de Castro y las precedentes decisiones, nos dice:

"s) *El derecho del causante a obtener indemnización de los daños y perjuicios* que se le hayan ocasionado durante su vida se transmite, naturalmente, a sus herederos, pues, en definitiva, es un derecho de crédito perfectamente transmisible al amparo

de las reglas generales que regulan la transmisibilidad de los derechos. Pero el caso es diferente cuando *la obligación de indemnizar surge a consecuencia de la muerte* producida al causante. En tal supuesto se discute si las personas que experimentan un perjuicio adquieren un derecho propio a exigir del responsable la indemnización correspondiente al daño material y moral que directamente han experimentado, o si en definitiva lo adquieren quienes justifiquen ser herederos de la víctima. Las consecuencias podrán ser muy distintas en uno y otra caso, aunque en ambos se considere que se trata de un derecho normalmente transmisible.

La jurisprudencia española relativa a esta cuestión ha sido especialmente examinada por Federico De Castro." (Énfasis en el original.)

5.—Se arguye que los daños morales del lesionado fenecido son especulativos. No lo son el grado mayor que cuando el lesionado muere luego de haber radicado su demanda por los daños morales que sufrió en cuyo caso hemos resuelto que la acción no se extingue sino que pasa y puede continuarse por sus herederos. Si bien es cierto que en este último caso existen unas alegaciones en la demanda del propio lesionado con respecto a sus daños, no es menos cierto que tales daños hay que probarlos y que por consecuencia, tanto en el caso en que el lesionado deja su demanda radicada antes de morir como en el caso de que la muerte le sobreviene antes de radicarla, el problema de probar sus daños morales es idéntico. En ambas situaciones hay que estimar el valor razonable de dichos daños a base de la naturaleza y extensión de las lesiones, del sufrimiento que debe ocasionar y del testimonio de los testigos que estuvieron junto al lesionado hasta que murió.

En el caso ante nos, la prueba demostró que el causante de los recurrentes tenía tres cuartas partes de su cuerpo quemado; no resistía ropa de ninguna especie; llegó a hablar con su esposa en el hospital aunque vivió sólo tres días. Testificó su viuda que "Su estado físico se veía que estaba

sufriendo demasiado." El Tribunal puede tomar conocimiento judicial de que todo ser humano consciente durante tres días con quemaduras en tres cuartas partes de su cuerpo sufre intenso dolores.

6.—Habiendo resuelto este Tribunal que la acción radicada por una persona antes de morir para recobrar indemnización por los sufrimientos que sufrió no muere con él, y, por el contrario, es transmisible a sus herederos porque no se trata de un derecho personalísimo, no vemos razón porqué el derecho a tal indemnización no sea igualmente transmisible cuando el lesionado muere antes de haber radicado la acción correspondiente para hacer valer tal derecho. Si el acto de hacer efectivo el derecho mediante la acción judicial en estos casos no es personalísimo igualmente no lo es el derecho de indemnización que da lugar a tal acción. No creemos que por el hecho de que circunstancias, tales como la gravedad del lesionado, su limitado término de vida pasado el accidente, y el estado de conmoción que necesariamente surge al ocurrir la tragedia, impiden o evitan que el lesionado radique su acción antes de morir, deban impedir en justicia la transmisión de tal derecho a sus herederos.

7.—Se nos ha dicho que esta conclusión no está en armonía con la doctrina que sentamos en *Robles Ostalaza* v. *U.P.R.*, 96 D.P.R. 583–593 (1968). Asumimos que esta aseveración se basa en que en dicho caso dijimos que "puede argumentarse que la causa de acción por daños a la persona es una de naturaleza personal o personalísima y que la compensación que repara el daño a la persona es privativa."

El alcance de este comentario en *Robles Ostalaza*, supra, debe determinarse dentro del marco de la cuestión resuelta en dicho caso, es decir, si la causa de acción por daños a la persona de una esposa es privativa de ella o de la sociedad de gananciales constituida por ella y su esposo. Al calificar dicha causa de acción como personal en el referido caso, debe entenderse que lo es a los efectos de justificar que es pri-

vativa de la persona que sufre el daño por los fundamentos expresados en la opinión en dicho caso. El hecho que ahora concluyamos que la causa de acción por los daños morales sufridos por tal persona no se extingue por su muerte sino que, por el contrario, sus herederos pueden reclamar tales daños, no es en forma alguna inconsistente o conflictiva con el hecho de que tal causa de acción es privativa de la persona que sufrió el daño. La subsistencia de dicha causa de acción en los herederos es más bien una doctrina complementaria y en todos sus aspectos armónica con la de que la causa de acción de un esposo o esposa por daños a su persona es privativa de la persona que los sufrió.

8.—La referida acción del lesionado fenecido está provista por los Arts. 41 y 584 del Código de Enjuiciamiento Civil aún en vigor en Puerto Rico y que leen así:

*"Si una persona con derecho a ejercitar una acción muriese* antes de terminar el período de prescripción requerido para deducir aquélla, y la causa de la acción subsistiera, *los representantes de tal persona podrán ejercitar dicha acción* después de la terminación de aquel período y dentro de un año de la defunción. Si una persona contra la cual puede ejercitarse una acción muriese antes de la terminación del período de tiempo requerido para dar principio a la misma, podrá deducirse dicha acción contra sus representantes, después de la terminación de aquel período, y dentro de un año después del nombramiento judicial del albacea o administrador testamentario." (Énfasis nuestro.)

Será deber de los administradores y mientras éstos se nombren, de los albaceas, representar al finado en todos los procedimientos comenzados por o contra el mismo antes de su muerte, *y los que se promovieran después por o contra el caudal de la herencia.* Las acciones o procedimientos instruidos por o contra el finado se suspenderán a su muerte ínterin se haga cargo el albacea o se nombre un administrador y el albacea o administrador quedará subrogado como parte en la acción." (Énfasis nuestro.) (32 L.P.R.A. secs. 255 y 2471.)

Hemos determinado el alcance del referido Art. 41 en varios casos que comentamos a continuación.

Radicada acción en cobro de parte del monto de un pagaré por el heredero del tenedor en contra de una heredera del deudor, concluyó este Tribunal en *Rovira* v. *Oliver*, 70 D.P.R. 114 (1949), que la acción procedía y no había prescrito pues dicho Art. 41 "amplía más bien que limita el término prescriptivo cuando las partes mueren antes de que expire el término."

En demanda de una heredera de los beneficios derivados de fondos depositados por su causante con los demandados y que éstos en parte invirtieron y en parte se apropiaron, se alegó enriquecimiento torticero en violación de un mandato. La causa de acción por devolución de dichos fondos expropiados y que falsamente se alegó se pagaron por concepto de una comisión, está comprendida en el Art. 1802 del Código Civil. El término de un año se cuenta desde que la demandante tuvo conocimiento de los hechos. El Art. 41 del Código de Enjuiciamiento Civil no puede tener efectos de acortar el término señalado para la prescripción. *McCormick* v. *González Martínez*, 49 D.P.R. 473, 477, 487, 489, 490 (1936).

En *Torres* v. *Sucn. Córdova*, 31 D.P.R. 897 (1923), se sostuvo una demanda de daños contra la Sucesión cuyo causante ocasionó los daños sosteniendo el Tribunal que lo dispuesto en el referido Art. 41 no favorece la Sucesión y es otro argumento más en favor del apelante.

En *Rivera* v. *Viejo*, 49 D.P.R. 906 (1936), se resolvió que el término "representantes" en el Art. 41 incluye a las personas realmente interesadas que son los herederos y al Administrador Judicial si lo hubiere. ([1])

---

([1]) El referido Art. 41 fue tomado del Art. 353 del Código de Enjuiciamiento Civil de California.

En esa jurisdicción no se ha considerado el caso de la supervivencia de la acción por daños personales no radicada en vida del lesionado. Los pocos casos resueltos tratan de la supervivencia de la acción para recobrar la posesión de bienes inmuebles o de un inmueble. *Harris* v. *McGovern*, 99 U.S. 161 (1879); *Hennessy* v. *The Instrument Trust Co.*, 228 P.2d 714 (D.C.A. Cal. 1924). En un caso de daños ocasionados por los actos impro-

La supervivencia de la referida acción del lesionado que muere, antes de radicarla, está en armonía con las disposiciones pertinentes sobre la sucesión. Arts. 559–602 Código Civil (31 L.P.R.A. secs. 2081–2084). (²)

Luego de un riguroso examen del estado de derecho sobre esta cuestión, nos dice el compañero García Martínez en su monografía titulada "Reconocimiento de la Acción Hereditaria por Muerte Ilegal", 27 Rev. C. Abo. P.R., 463, 476 (1966–67), que:

"3.—El reconocimiento de la existencia de esa acción y de su transmisibilidad es una medida de justicia por cuanto permite el resarcimiento de los daños cuando la lesión produce el daño máximo que es la muerte.

4.—El reconocimiento de la acción de la víctima inicial y de su transmisibilidad a los herederos en modo alguno conflige y por el contrario complementa la acción propia de aquellos que, *siendo o no siendo herederos,* se perjudican con la muerte de la víctima inicial.

5.—El reconocimiento de la acción de la víctima inicial y de su transmisibilidad está en armonía con el principio civilista de la sucesión universal en los derechos y obligaciones del causante aceptando como premisa fundamental que se trata de un derecho personal transmisible y no personalísimo intransmisible.

6.—El reconocimiento de la acción de la víctima inicial y de su transmisibilidad sería la rúbrica del rechazo definitivo de la arcaica e injusta doctrina de que las acciones personales mueren con la persona."

---

pios de un abogado se resolvió que podía radicarse la acción en contra de su "estate". Igualmente se dijo que la acción por servicios rendidos a una persona que murió antes de radicarse la acción, ésta le sobrevivía. *Fazio* v. *Hayburst,* 55 Cal. Rptr. 370 (D.C.A. Cal. 1967); *Vonchina* v. *Turner's Estate,* 315 P.2d 723 (D.C.A. Cal. 1957).

(²) Estas disposiciones fueron tomadas del Código Civil de Luisiana (Arts. 871–874 de dicho Código).

En esa jurisdicción se ha resuelto que el derecho de acción de un donante para atacar la donación es una causa de acción heredable. Así también lo es la que se funda en una obligación que nace de un contrato de correr un caballo. *Castleman* v. *Smith,* 86 So. 778 (La. 1920); *Grayson* v. *Whatley,* 15 La. Ann. 525 (1860).

En vista de lo expuesto creo que debemos reconocer el derecho de los herederos a recobrar por los daños morales sufridos por su causante los que estimo en la suma de $10,000.00.