TEXTO COMPLETO DE LA SENTENCIA
Tenemos ante nos tres recursos de apelación. El KLAN-2006-00456 fue presentado el 12 de abril de 2006, por Televicentro de Puerto Rico, LLC (en adelante, Televicentro o Demandado). El KLAN-2006-00482 fue presentado el 19 de abril, por Adolfo Krans Bell (en adelante, Sr. Krans o Demandante) y sus hijos, Kendall, Kenneth, Gretchen y Karushka, todos de apellidos Krans Negrón (en adelante, Hijos Krans o Demandantes). Y el KLAN-2006-00512 fue presentado el 26 de abril, por Antulio Santarrosa Acevedo (en adelante, Sr. Santarrosa o Demandado), su esposa, Iris Lugo Carrera, y la sociedad legal de gananciales por ambos compuesta, y J&K Enterprises, Inc. (en adelante, JK). Los apelantes, desde distintas perspectivas y señalamientos de errores, persiguen la modificación y revocación parcial o total de la Sentencia que dictó el Tribunal de Primera Instancia, Sala Superior de Bayamón en San Juan (en adelante, TPI), el 7 de marzo de 2006, la cual se notificó el 9 de marzo.
Los días 4 y 12 de mayo de 2006, consolidamos los tres recursos. Con posterioridad, pautamos el trámite de la trascripción de la prueba (en adelante, Transcripción), y los alegatos de las partes, tanto suplementarios como de oposición. Al presente, contamos con las comparecencias de todas las partes, y así perfeccionadas las causas de título, procedemos a resolverlas.
En virtud de los fundamentos que a continuación esbozamos, confirmamos la apelada Sentencia.
I
El 2 de agosto de 2002, el Sr. Krans y sus 4 hijos presentaron una demanda sobre daños y perjuicios contra el Sr. Santarrosa y Televicentro. Reclamaron daños y perjuicios a raíz de una información difamatoria difundida a través del programa Super Xclusivo. Específicamente, el Demandado le imputó una relación adulterina al Sr. *1043 Krans.
Transcurridos varios trámites y un amplio descubrimiento de prueba, el TPI celebró juicio durante los días 5, 8, 9, 19 y 21 de diciembre de 2005. Luego de considerar toda la prueba documental y testifical, el foro sentenciador resolvió declarar con lugar la demanda y condenar al Sr. Santarrosa y Televicentro a pagar solidariamente la suma total, incluidos los honorarios, de doscientos setenta mil dólares ($270,000.00), a favor de los Demandantes. Esta partida dineraria se desglosó de la siguiente manera: $180,000.00, para el Sr. Krans; $20,000.00, para cada uno de los Hijos Krans; y $10,000.00, por concepto de honorarios.
El 16 de marzo de 2006, Televicentro presentó dos mociones ante el TPI; una de reconsideración parcial, y otra de determinaciones de hechos y conclusiones de derecho adicionales. Ese mismo día, pero con notificación del 20 de marzo, el TPI rechazó de plano ambas solicitudes.
Simultáneamente, el 20 de marzo, el Sr. Santarrosa presentó una solicitud de determinaciones de hechos y conclusiones de derecho adicionales. El 21 de marzo, notificada el 27 de marzo, el TPI también rechazó de plano dicha solicitud.
Seguidamente, y por no estar conformes con la decisión del TPI, ante este Tribunal de Apelaciones todas las partes radicaron sendos recursos de apelación, en las fechas antes indicadas.
Televicentro señaló los siguientes dos errores:

“Erró el Tribunal de Primera Instancia, Región Judicial de Bayamón, en la apreciación de la prueba, al imponerle al apelante el pago de unas cuantías en indemnización que no concuerdan con la prueba desfilada y contradicen el estado de derecho.

Erró el Tribunal de Primera Instancia, Región Judicial de Bayamón, al imponerle al apelante el pago de honorarios de abogado a pesar de no mediar temeridad de su parte. ”

Los Demandantes hicieron sólo un señalamiento de error, a saber:

“Erró el Tribunal de Primera Instancia, Sala Superior de Bayamón, al no conceder a la parte demandante los daños económicos reclamados en la demanda radicada, a pesar de haberse establecido mediante preponderante prueba documental y pericial presentada en el acto del juicio, que el demandante Adolfo Krans Bell sufrió dichos daños. ”

Por último, el Sr. Santarrosa señaló los doce errores que a continuación trascribimos:

“Erró el Tribunal de Primera Instancia al concluir que medió malicia real en las divulgaciones alegadamente difamatorias.

Erró el Tribunal de Primera Instancia al no aplicar correctamente el estándar de prueba clara y convincente.

Erró el Tribunal de Primera Instancia al no aplicar la figura de la hipérbole retórica.

Erró el Tribunal de Primera Instancia al mezclar indebidamente el contenido de los dos programas de televisión separados y distinguibles.

Erró el Tribunal de Primera Instancia al imponer responsabilidad sobre una divulgación que no mencionan nombre ni imputa (of and concerning the plaintiff).

*1044
Erró el Tribunal de Primera Instancia al conceder una compensación por angustias mentales de carácter punitivo.

Erró el Tribunal de Primera Instancia al aplicar criterios discriminatorios en la evaluación de los daños.

Erró el Tribunal de Primera Instancia al no percatarse de que la imposición de daños exagerados en el contexto de este caso provoca una violación constitucional adicional.

Erró el Tribunal de Primera Instancia al no determinar que los alegados daños de los demandantes deben ser imputables sustancialmente a una primera divulgación claramente protegida y a eventos distintos no relacionados con los demandados.

Erró el Tribunal de Primera Instancia en la apreciación de la prueba y al no formular determinaciones sobre hechos críticos.

Erró el Tribunal de Primera Instancia al determinar que los demandados procedieron con temeridad y que tal determinación en este caso plantea una violación a la libertad de expresión.

Erró el Tribunal de Primera Instancia al no resolver que la parte demandante procedió con temeridad. ”

Con el beneficio de los elaborados legajos de todas las partes, la Transcripción, y la totalidad de los autos, adjudicamos la presente apelación consolidada. Antes de entrar a la exposición, análisis y aplicación del Derecho, debemos consignar los siguientes hechos, que del expediente emergen como hechos que no están en controversia.
El Sr. Krans es el único accionista y propietario de dos corporaciones; una de mercadeo de seguros, Adolfo Krans & Associates, Inc. (en adelante, AKA); y la otra, AKA International Investments, Inc. (en adelante, AKAII), que figura como propietaria del edificio en que ubican las oficinas de AKA. Ni AKA ni AKAII figuraron como demandantes en la presente causa.
El Sr. Santarrosa, por conducto de su corporación JK, produce el programa de televisión, SuperXclusivo, el cual se transmite en horario estelar por el Canal 4 de Televicentro. A esos efectos, para el año 2001, existía un contrato entre Televicentro y JK; tan es así, que cuando SuperXclusivo se propone a presentar temas sensitivos, antes de ello, la gerencia de Televicentro recibe la información para asegurarse de que la misma fue corroborada y es confiable.
En SuperXclusivo, el Sr. Santarrosa manipula una especie de muñeca, mitad títere, mitad humana, pues sus piernas son las del Sr. Santarrosa. Se trata del también conocido personaje, “La Comay". Éste divulga información mayormente de farándula y figuras públicas.
El 3 de agosto de 2001, “La Comay”, entiéndase el Sr. Santarrosa, declaró que el Sr. Krans sostenía una relación extramarital. Para esta fecha, el Sr. Krans era el esposo de la entonces gobernadora del Estado Libre Asociado de Puerto Rico, Hon. Sila María Calderón Serra (en adelante, Sra. Calderón).
Cabe resaltar que el Sr. Krans participó activamente en ambas campañas políticas de la Sra. Calderón -tanto para la elección como alcaldesa de San Juan (1996), como para la de gobernadora. (2000). De igual modo, el Sr. Krans se afianzó como figura pública. Participa como ponente en el programa radial “Fuego Cruzado”, y asimismo se ha expresado vigorosamente en diversos foros, a favor de la unicameralidad, ello, antes, durante y después del referéndum que a esos efectos se celebró en el verano del 2005.
Inmediatamente luego de la difusión de la supuesta relación adulterina del Sr. Krans, específicamente, el 3 de *1045 agosto de 2001, tanto el Demandante como el país se enteraron de la decisión de la Sra. Calderón, de su deseo e intención de divorciarse del Sr. Krans.
El Sr. Krans y 3 de sus hijos, los cuales se encontraban en Puerto Rico, se reunieron en las oficinas de AKA, para ver SuperXclusivo, donde “La Comay” leyó el comunicado de prensa de la Sra. Calderón, sobre el divorcio, y nuevamente le imputó al Demandante mantener una relación adúltera.
A pesar de que el 6 de agosto de 2001, Kendal Krans Negrón, codemandante, le remitió una misiva al Sr. Ramos, gerente de Televicentro, para que se retractara de la falsedad publicada por SuperXclusivo; ello no ocurrió. Sucedió todo lo contrario, pues el 7 de agosto de 2001, “La Comay” mostró un vídeo que alegadamente comprobaba la relación extramarital que antes le había imputado al Sr. Krans. Aunque se mostró un vídeo, nunca se reprodujo su contenido. Tanto Carmen Jovet Esteves (en adelante, Sra. Jovet), como Leo Fernández IH (en adelante, Leo III), declararon que dicha evidencia -la del vídeo que alegadamente verificaba la relación adulterina-, nunca existió. Incluso, el propio Sr. Santarrosa admitió que nunca tuvo en su poder tal evidencia, y que mostró el vídeo sólo para generar una impresión de corroboración, y que no tenía evidencia alguna corroborativa de la imputación de adulterio al Sr. Krans, salvo la información suministrada por Leo DI. [1] Véase Transcripción del Testimonio del Sr. Santarrosa, páginas 45 y 81-91, especial, páginas 82-83, respectivamente, líneas 23-25 y 1.
Apenas a tres meses de las controvertidas transmisiones, el Sr. Krans y la Sra. Calderón se divorciaron.
Durante el juicio, testificaron el Sr. Krans, los Hijos Krans, la Sra. Jovet, Leo HI -como testigo no disponible, vía deposición-, el Sr. José E. Ramos Negrón (en adelante, Sr. Ramos), y una empleada del Sr. Santarrosa, Angie Colón. También ofrecieron sus testimonios, el Sr. Stipec, el CPA Mari, y el Ledo. Fermín Contreras, hijo, el Sr. Santarrosa, Enrique Sánchez Vidal, y la secretaria del Sr. Santarrosa, Karen Berrios Tejada.
Entre la prueba documental recibida por el TPI, figuran los informes periciales sobre daños económicos. Y entre la prueba objetiva, consta un vídeo de la entrevista que le hizo la Sra. Jovet a Leo HI, el cual se designó como Exhibit I. Véase Minuta del TPI, del 5 de diciembre de 2005.
A la luz de la prueba desfilada, quedó palmariamente claro que las declaraciones del Sr. Santarrosa, por conducto de “La Comay”, en SuperXclusivo, transmitido por Televicentro, le causaron al Sr. Krans y los Hijos Krans, angustias mentales, “afectándose en mayor o menor grado sus respectivas vidas sociales y profesionales. Sintieron el dolor de ver como impunemente se mancillaba el honor y el prestigio del apellido Krans”. Véase Apéndice del KLAN-2006-00456, página 34.
Los daños económicos que formaron parte de los reclamos incluidos en la demanda del Sr. Krans, no pudieron ser probados. Ni el perito económico, Bartolomé Stipec, ni el contador público autorizado, Juan Mari Agostini, pudieron establecer respectivamente: que las pérdidas económicas de las empresas del Sr. Krans estaban relacionadas con las pérdidas personales del mismo; que las pérdidas operacionales de las empresas estaban ligadas a las pérdidas personales del Sr. Krans, entiéndase la imputación de adulterio, y la simultánea situación del divorcio.
II
Tanto nuestra Constitución, como la Federal, protegen la libertad de expresión, no su libertinaje.
Comencemos por manifestar que aunque parezca injusto, “[n]o hay duda alguna de que a una figura pública se le puede difamar. Es legal. Por el mero hecho que una persona se inyecte en la vida pública del país, ya asume el riesgo. Las disposiciones legales sobre libelo y calumnia que protegen a cualquier persona privada se aplican diferente a la figura pública. Esto no quiere decir que una [figura] pública esté desprovista de *1046 defender su honra y la de su familia. Sólo que es más difícil. Aquí pretendo describir ese espacio incómodo angosto [pero no quimérico] al que tiene derecho. Tal vez así, ante la incapacidad de algunos medios para fiscalizar sus propios excesos, se cree conciencia de que existen límites y que las trasgresiones pueden ser materia de reclamo. ” (Subrayado nuestro), E. Báez Galib, Libertad de Prensa y difamación, El Vocero de Puerto Rico, Lunes, 12 de febrero de 2007, pág. 42. Citamos lo anterior como marco de referencia social, y no como precedente jurídico.' Y es que lo precitado resume de modo ideal como nuestro Estado de Derecho podría entornarse al caso que nos ocupa. Revisemos entonces el marco jurídico pertinente.
El Artículo 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. See. 5141, establece una causa de acción de daños y perjuicios en beneficio de la persona que ha sufrido un daño, ya por acción u omisión. Los elementos de esta causa son: daño real, acción u omisión culposa o negligente, y nexo causal entre el acto u omisión y el daño. Hernández Vélez v. Televicentro de P.R., res. el 1 de septiembre de 2006, 2006 JTS 151; Rivera Colón v. Díaz Arocho, res. el 26 de agosto de 2005, 2005 JTS 121; Tormos Arroyo v. D.I.P., 140 D.P.R. 265, 274 (1996).
El daño sufrido tiene que ser real, no puede ser uno pasajero. Asimismo, está firmemente establecido que el concepto daños implica, “todo aquel menoscabo material o moral que sufre una persona, ya en sus bienes vitales naturales, ya en su propiedad o en su patrimonio, causado en contravención a una norma jurídica y por el cual ha de responder otra”. Santini Rivera v. Serv. Air, Inc., 137 D.P.R. 1, 7 (1994).
Al amparo del Artículo 1802, supra, los daños pueden ser materiales o morales. Cintrón Adorno v. Gómez, 147 D.P.R. 576 (1999). Por ello, aunque la valoración de los daños morales no tiene de por sí un equivalente matemático, por ser éstos daños intangibles, como el sufrimiento y las angustias mentales, sí son compensables en dinero. Incluso su compensación podría exceder la de los daños materiales. García Pagán v. Shilley Caribbean 122 D.P.R. 193 (1988).
Cuando de daños económicos se trata, la parte que los reclama tiene que establecer por vía de preponderancia de la prueba, que, existe causalidad adecuada respecto todos los daños reclamados, inclusive los daños económicos. Soto Cabral v. E.L.A., 138 D.P.R. 298 (1995). Tiene que establecerse que los daños económicos fueron “la consecuencia razonable y común de la acción u omisión de que se trate”. Bacó v. ANR Construction Corp., res. el 23 de septiembre de 2004, 2004 JTS 162.
La culpa o negligencia estriba en la “falta del debido cuidado, esto es, no anticipar ni prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en tales circunstancias”. Montalvo Feliciano v. Cruz Concepción, 144 D.P.R. 748, 755 (1998).
El deber de previsión, “no se extiende a todo peligro imaginable”, sino al peligro que una persona prudente y razonable anticiparía; Hernández v. Gobierno de la Capital, 81 D.P.R. 1031, 1038 (1960); se trata de probabilidades, no meras posibilidades. López v. Porrata Doria, res. el 4 de octubre de 2006, 2006 JTS 159.
“En esencia, la parte a quien se le imputa haber causado daño puede ser responsable de todo aquel daño que parezca ser una consecuencia natural y probable de su acto u omisión. Ello por razón de que la acción culposa o negligente ciertamente supone la infracción de alguna norma ya proveniente de la ley, de algún contrato o ya lesione principios jurídicos “superiores” incluyendo todo aquel “atentado a las buenas costumbres”.” (Subrayado nuestro). Valle Izquierdo v. E.L.A., 157 D.P.R. 1, 20 (2002). El causante del daño tiene que haber incurrido en una conducta antijurídica en detrimento de quien reclama haber sufrido daños. Ramos Lozada v. Orientalist Rattan Furniture, Inc., 130 D.P.R. 712 (1992). Al tenor de la responsabilidad vicaria y la indivisibilidad de daños cuando dos o más los causan, estos causantes responderán solidariamente ante el que sufrió los daños. Véase 31 L.P.R.A. See. 5142; S.L.G. Szendrey v. Hospicare, Inc., res. el 14 de febrero de 2003, 2003 JTS 25; Torres v. A.F.F., 94 D.P.R. 314 (1967).
*1047 Hoy, como antes, impera en todo su rigor, la doctrina de causalidad en el análisis del elemento de nexo causal. López Delgado v. Cañizares Baquero, res. el 5 de octubre de 2004, 2004 JTS 165; Pons v. Engebretson, res. el 30 de septiembre de 2003, 2003 JTS 151; Administrador F.S.E. v. Almacén Ramón Rosa, Inc., 151 D.P.R. 711 (2000). Esto implica que para que exista o concurra una relación entre el daño sufrido y la causa que alegadamente lo generó, ya por acción u omisión, debemos prestar atención a que la causa alegada sea la adecuada, pues “no es necesario que se pruebe con exactitud matemática que el accidente se debió a una causa con exclusión de todas las demás probabilidades, pero debe demostrarse que ninguna de éstas, en el caso de ser justamente sugeridas por la prueba, fue la causa”. Viuda de Delgado v. Boston Ins. Co., 99 D.P.R. 714, 725 (1971).
La relación de causalidad entre el daño y el acto o la omisión no puede estar basada en una mera especulación o conjetura. Blas Toledo v. Hosp. Nuestra Señora de la Guadalupe, 146 D.P.R. 267, 322 (1998). No tiene que ser una causa con exactitud matemática, pero que de sugerirse otras causas, justamente queden éstas descartadas por la causa decisiva o próxima. Todo ello según la prueba desfilada ante el foro de Instancia. Soto Cabral v. E.L.A., supra, página 138; Viuda de Delgado v. Boston Insurance Co., 99 D.P.R. 714, 725 (1971).
Probados cada uno de los elementos reseñados, la cuantía del daño se determinará según las particulares circunstancias de cada caso, y de conformidad con la prueba desfilada a esos efectos. A estos fines, el TPI goza de amplia experiencia y discreción para establecer la necesaria cuantía y justa compensación. Nieves Cruz ex rel. Hernández Nieves v. U.P.R., 151 D.P.R. 150, 176 (2000). Como foro apelativo, este Tribunal no intervendrá con las determinaciones del TPI, salvo que mediante prueba fehaciente quede establecido que la suma pecuniaria concedida por el foro sentenciador fue ridiculamente baja o exageradamente alta. S.L.G. Rodríguez v. Nationwide, 156 D.P.R. 614, 623 (2002). Quien solicita modificar la cuantía concedida, tiene el peso de la prueba. Rivera Rodríguez v. Tiendas Pitusa, Inc., 148 D.P.R. 695, 700 (1999).
Estimar y valorar daños es una difícil y angustiosa tarea, pues no existe un sistema de certera computación que arroje un resultado exacto con el que todas las partes afectadas queden satisfechas. Blas Toledo v. Hosp. Nuestra Señora de la Guadalupe, supra, página 339; Rodríguez Cancel v. A.E.E., 116 D.P.R. 443, 451 (1985). Es por ello que, sin ser necesariamente obligatorio o tener la fuerza de precedente, se acude a casos similares para estimar los daños, cuya cuantía deberá actualizarse luego. S.L.G. v. F.W. Woolworth & Co., 143 D.P.R. 76, 82 (1997); A.J. Amadeo Murga, El Valor de los Daños en la Responsabilidad Civil, Tomo I, Capítulo II, San Juan, Editorial Esmaco, 1997, y Escobar Galarza v. Banuchi Pons, 114 D.P.R. 138, 148 (1983) (Opinión Concurrente del Hon. Rebollo López).
Asimismo, es norma firmemente establecida en Derecho Apelativo que, de ordinario, no intervendremos con la apreciación de la prueba y la credibilidad adjudicada, ni con las determinaciones de hechos -incluso la valoración de daños- del foro sentenciador, salvo que éste haya incurrido en error manifiesto, pasión, prejuicio o parcialidad. Trinidad García v. Chade, 153 D.P.R. 280, 291 (2001). Tal principio está cimentado en que las decisiones del foro de Instancia están revestidas de una presunción de corrección y regularidad, de modo que merecerán nuestra deferencia. Pueblo v. Rivera Nazario, 141 D.P.R. 865, 874 (1996). Después de todo, es el foro juzgador el que está “en mejor posición para evaluar la prueba desfilada, pues [tiene] la oportunidad de very oír a los testigos declarar”. Pueblo v. Maisonave Rodríguez, 129 D.P.R. 49, 63 (1991). Ahora, si la apreciación que de la prueba hizo el foro juzgador, se aleja de la realidad fáctica, o la prueba resulta inherentemente imposible o increíble, entonces podemos y debemos intervenir con la apreciación de la prueba y las determinaciones del Tribunal de Instancia. Pueblo v. Maisonave Rodríguez, supra. Para poder detectar si el foro sentenciador erró al resolver finalmente un caso, debemos atender el valor probatorio de la evidencia desfilada. Otero Mercado v. Toyota de Puerto Rico Corp., res. el 3 de febrero de 2005, 2005 JTS 13. En cuanto a la prueba documental y objetiva, estamos en idéntica posición que el TPI para pasar juicio sobre la misma. Arrieta v. De la Vega, res. el 9 de septiembre de 2005, 2005 JTS 134. Nos compete entonces, considerar con extrema cautela la totalidad de la prueba. Especialmente, cuando de la valoración de daños se trata, debemos cuidar de que la compensación emerja *1048 de la prueba desfilada, así como que no pierda su carácter reparador y fin remediador. S.L.G. v. F.W. Woolworth & Co., supra.
En materia de daños por difamación a una figura publica, resulta preciso establecer un balance entre dos derechos fundamentales consagrados en nuestra Constitución. Cabe destacar que una figura pública se distingue porque tiene prominencia en la sociedad, y capacidad para influenciar y persuadir en asuntos de interés público. Esto es, poner en justa perspectiva y equilibrio el derecho a la dignidad, honra, reputación y vida privada del ser humano vis a vis la libertad de expresión y prensa. Véase Tomo I L.P.R.A. Art. II Secs. 1, 4 y 8.
Aunque los reseñados derechos constitucionales fundamentales operan ex propio vigore, la Ley de Libelo y Calumnia, Ley del 19 de febrero de 1902, 32 L.P.R.A. See. 3141 et seq., complementa la protección y el balance de los mencionados derechos.
Por su parte, el Artículo 1802, supra, también integra la protección y balance que hemos indicado. Así, una demanda sobre daños y perjuicios por difamación deberá establecer mediante prueba que una información falsa fue publicada, ya por escrito (libelo), ya oralmente (calumnia), y constituyó un ataque a la honra y reputación del agraviado. 32 L.P.R.A. See. 3142 y 3143. Mientras la información falsa publicada representa, necesariamente, la causa directa de los daños reclamados, éstos deberán surgir del menoscabo de la opinión que los demás tienen del valor del quejoso, a raíz de la información publicada. El fin jurídico protegido es la reputación personal y el derecho a defender el nombre propio frente a los demás, lo que a su vez abarca cuatro aspectos: “(1) proteger las relaciones que sostiene con terceros; (2) proteger la probabilidad de relaciones futuras con terceros; (3) proteger su imagen publica en general, y (4) evitar que se le cree una imagen pública negativa si careciere de reconocimiento público en el presente”. Sociedad de Gananciales v. El Vocero de Puerto Rico, Inc. 135 D.P.R. 122, 127 (1994).
Ahora, aunque en casos de personas privadas, bastaría con establecer mediante prueba que la parte demandada fue negligente al no corroborar una información falsa, y por el contrario publicarla en détrimento del demandante,, en el caso de una figura pública el proceder es otro. Porto y Siurano v. Bentley P.R., Inc 132 D.P.R. 331, 345(1992).
Cuando de una figura pública se trata, hay que establecer que medió malicia real en la publicación de la información falsa. Entiéndase que la prueba tiene que establecer que el demandado a sabiendas de la falsedad, y con grave menosprecio de ello, publicó la información. El estándar de prueba es más riguroso en estos casos, precisamente porque se desea armonizar, de un lado, el derecho a la libertad de expresión, y de otro, el derecho a la dignidad y la honra. New York Times Co. v. Sullivan, 376 U.S. 254 (1964); Sociedad de Gananciales v. El Vocero de Puerto Rico, Inc., supra; S.L.G. v. López Cintrón, 116 D.P.R. 112 (1985). Además, tal riguroso estándar se fundamenta en que la figura pública se ha sometido a ser rigurosamente escrutada por la sociedad, y tiene mayor accesibilidad a los medios de comunicación para defenderse de ataques a su persona. Garib Bazain v. Clavell, 135 D.P.R. 475 (1994); Torres Silva v. El Mundo, Inc., 106 D.P.R. 415 (1977). No obstante, coincidimos con Romero Coloma en que “la notoriedad no debe permitir nunca que la prensa y el público entren descaradamente en la vida privada de los personajes importantes. A ellos hay que reconocerles también el derecho a una vida privada que debe quedar amparada de intrusiones ajenas. No es admisible autorizar una publicación indiscriminada ni una supresión total de la intimidad”. A.M. Romero Coloma, Derecho a la intimidad, a la información y proceso penal, Editorial Colex, 1987, pág. 89. Bien lo manifiesta el TPI en la Sentencia apelada, al expresar: “El omitir corroborar información que por su contenido es altamente previsible que le cause -daño a los protagonistas, Va a Id médula del asunto. La falta de diligencia del señor Santarrosa y de Televicentro de Puerto Rico hiere tajantemente el derecho fundamental a la libertad de prensa; la libertad de prensa no nos da derecho a mentir y mucho menos a mancillar y desacreditar reputaciones”. Véase Apéndice del KLAN-2006-00456, página 40.
*1049 Regresando al requisito de malicia real, éste significa conocimiento de la falsedad de lo expresado, e implica, “exponer a dicha persona [el difamado] al odio del pueblo o a su desprecio, o a privarle del beneficio de la confianza pública y trato social, o a perjudicarle en sus negocios; o de otro modo desacreditarle, menospreciarle o deshonrarle”. Véase 32 L.P.R.A. See. 3142. Nunca se presume, sino que con hechos específicos hay que probarla. Torres Silva v. El Mundo, Inc., supra. El grado de prueba requerido debe ser el de prueba clara y convincente. García Cruz v. El Mundo, Inc., 108 D.P.R. 174, 180 (1978). A esos efectos, el grave menosprecio de la malicia real, implica alto grado de conocimiento de la probabilidad de la falsedad. Esto es, que se tenían serias dudas de la certeza de la información. Cabrero Muñiz v. Zayas Seijo, res. el 5 de mayo de 2006, 2006, 2006 JTS 86. Sobre los honorarios por temeridad, recordemos que temerario es aquél que niega su responsabilidad y obliga a la parte reclamante a litigar e ir ajuicio. Véase Fernández Mariño v. San Juan Cement Co., Inc., 118 D.P.R. 713, 718-719 (1987). Los honorarios por temeridad persiguen sancionar a la parte perdidosa que por su terquedad, obstinación o insistencia y actitud desprovista de fundamentos, empuja a la otra parte a asumir las molestias, y los gastos e inconveniencias de un pleito. Véase O.E.G. v. Román González, res. el 1 de mayo de 2003, 2003 JTS 74.
Por la estrecha relación que guardan los quince errores traídos por las partes ante nuestra consideración, los resumimos en la siguiente controversia: Si incurrieron en responsabilidad extracontractual, el Sr. Santarrosa y Televicentro, al difamar al Sr. Krans, imputándole una relación adulterina. Adelantamos que la contestación a esta pregunta es en la afirmativa.
Al enmarcar el recuento fáctico de la presente causa en la demarcación jurídica esbozada, arribamos a la conclusión de que no incurrió el TPI en ninguno de los errores imputados por los tres apelantes. En consecuencia de ello, confirmamos la Sentencia apelada. Explicamos.
Adelantamos que a raíz de los comentarios y expresiones del Sr. Santarrosa, a través de su programa Super Xclusivo, trasmitido por Televicentro, los Demandantes sufrieron daños en su honra y dignidad familiar. Los Demandados, a sabiendas de que la información era falsa, y con grave menosprecio de ello, divulgaron la misma, siendo este conocimiento y esta divulgación las causas directas y adecuadas de los daños y angustias sufridos por el Sr. Krans y sus hijos.
Los tres elementos de su causa de acción sobre daños y perjuicios, los Demandantes los establecieron mediante prueba clara y convincente. La acción culposa fue la publicación de información falsa a sabiendas de ello, y con grave menosprecio de su falsedad. Por ello, el Sr. Santarrosa y Televicentro incurrieron en malicia real al publicar la supuesta infidelidad del Sr. Krans. Esta difamación maliciosa fue la causa directa y adecuada de los daños que el Sr. Krans y sus hijos sufrieron. Estos daños consisten en el menoscabo y la degradación de la opinión pública respecto a la honra y la dignidad de los Demandantes. La prueba demostró nítidamente los vejámenes a que fueron expuestos el Sr. Krans y los Hijos Krans, como consecuencia de la difamación maliciosa por parte de los Demandados. No hay que ser perito en la conducta humana para colegir que una imputación de infidelidad afecta tanto a un esposo como a una esposa, como a la familia entera, en especial los hijos.
Sobre el elemento o ingrediente adicional en el caso del Sr. Krans, por ser éste figura pública, la malicia real, el Sr. Santarrosa lo discute a la saciedad en su apelación, para intentar persuadirnos de que no medió tal malicia en las controvertidas publicaciones. No tiene razón. La prueba lo refuta. En primer lugar, la supuesta relación adulterina del Sr. Khans resultó ser falsa. El divorcio del Demandante y la Sra. Calderón fue por otra causa ajena al adulterio. En segundo lugar, el Sr. Santarrosa sabía que tal imputación era falsa, pues su supuesta fuente, Leo III, negó que le hubiese brindado la información. Y más importante, conociendo la falsedad de la infidelidad, el Sr. Santarrosa procedió a divulgar la información, y peor aún, alegó poseer evidencia objetiva - una cinta de vídeo, la cual conocía que carecía de contenido, o sea, estaba en blanco; un cascarón vacío- que corroboraba el hecho.
*1050 De otra parte, pretende cobijarse el Demandado en las doctrinas de hipérbole retórica y de, of and concerning the plaintiff. No tiene razón. Una imputación tan seria como la de adulterio no puede tomarse a broma ni evaluarse tímida ni livianamente. Nos resulta curioso que el Sr. Santarrosa recurre a las doctrinas y el Estado de Derecho aplicable primordialmente a los medios de comunicación noticiosos -que al menos en principio, no son programas de comedia, farándula, ni burlas o sátiras- para exaltarse como periodista protegido, férreo defensor y exponente del derecho a la libertad de expresión, pero a su vez alude a que el vídeo vacío que mostró como evidencia, era una broma, una exageración, algo para hacer creer al público que lo poseía, que se trataba de un acto histriónico. También arguye que nunca se refirió explícitamente al Sr. Krans. “Los jueces no debemos, después de todo, ser tan inocentes como para creer declaraciones que nadie más creería”. Pueblo v. Luciano Arroyo, 83 D.P.R. 573, 582 (1961). Trata de hacernos ver el Demandado que la falsedad publicada merece la protección de una noticia, pero a su vez también debe interpretarse como una broma, como una alusión metafórica, para entonces gozar de la protección del lenguaje figurado propio de las artes. No sólo se contradice el Demandado, sino que dicha contradicción es crasamente improcedente e indigna de protección como expresión constitucionalmente válida.
A todas luces, la difamación perpetrada por el Sr. Santarrosa es ilegal, y le generó daños tanto al Sr. Krans como a su familia.
De otra parte, en lo que respecta a los daños económicos, si bien resulta persuasivo el argumento del Sr. Krans de que la legislación aprobada y vigente para la fecha de los hechos, no afectó sus negocios -pues los seguros mercadeados por AKA no son los mismos que los bancos fueron autorizados a mercadear, en virtud de la ley aprobada-, no nos convence. Véase Apelación del Sr. Krans, página 19. Si bien el Sr. Krans presentó amplia prueba documental testifical y pericial sobre las pérdidas o merma en sus negocios, lo cierto es que la prueba y la metodología observada para levantar la evidencia, no fue la más idónea y por ende no resulta confiable, pertinente, ni convincente. Los peritos, más allá de la contemporaneidad, no pudieron establecer una relación minima entre la merma en clientes y la difamación sufrida. El TPI no halló prueba de tal causalidad. Nosotros, luego de revisar de novo el expediente y los informes periciales, coincidimos.
El único criterio utilizado para establecer los daños económicos, fue: clientes y fecha de terminación de negocios con AKA. Nada más se utilizó para evidenciar la relación entre los daños económicos sufridos y la difamación. Ni la prueba documental ni la testifical pudieron establecer las razones que tuvieron los clientes para culminar su relación de negocios con AKA. No vemos, aunque sea una posibilidad, que se estableciera que la causa directa de la merma económica fue la calumnia de los Demandados.
Por su parte, Televicentro propone que la jurisprudencia federal y estatal pauta el principio de que la protección contra la difamación a personas privadas es de mayor rango que la protección a las figuras públicas, y que, por lo tanto, las figuras públicas difamadas no pueden aspirar a similares o mayores compensaciones que aquellas concedidas a las figuras privadas. Torres Silva v. El Mundo, Inc., supra, página 422; Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974). Sin embargo, las citas a que apunta el Demandado no se refieren a las cuantías de los daños, sino a la procedencia o no de la acción por difamación. Lo que nos indica la jurisprudencia es que será más difícil para una figura pública instar una demanda por difamación, y consecuentemente tener éxito, o sea, probar su caso. Cuando la jurisprudencia manifiesta que las figuras privadas serán, more deserving of recovery , y que [l]a reparación del daño en [casos de difamación a figuras privadas] es más digna de ser atendida y más justificado el interés del estado en proteger su reputación , para nada avala la tesis de Televicentro. Lo que implican tales pronunciamientos es que para una figura pública probar que fue difamado maliciosamente, el camino será más difícil, pero no imposible. Nada tienen que ver los pronunciamientos de las judicaturas con la cuantía de los daños. Según vimos, la valoración se atenderá conforme las circunstancias particulares de cada caso.
Igualmente propone Televicentro que al TPI considerar que el Sr. Krans pertenecía a “la primera familia *1051 del país”, para aquilatar la cuantía de los daños, ello constituyó un atentado a la veda constitucional de discrimen por condición social. No nos adentraremos en la discusión de tan fundamental derecho, pues basta destacar que para efectos de evaluar el impacto de la difamación, el que el Demandante fuera el esposo de la Sra. Calderón, entonces gobernadora insular, sí era un factor pertinente y necesario para la valoración de daños. El ser esposo de una gobernadora, por la exposición pública que ello conlleva, obviamente aportó a que la difamación fuera difundida con mayor alcance.
Por último, opinamos que la vida privada de las figuras públicas continúa siendo eso, sus vidas privadas, esto es, el conjunto de actividades y asuntos de su entorno íntimo. Y más importante, tienen igual protección que la vida privada a la que todos tenemos derecho a disfrutar y la cual está revestida de fundamental rango constitucional. Ahora bien, la figura pública sí ve menguada la protección de su vida privada debido a que voluntariamente se ha expuesto al rigor del juicio público. Sin embargo, tal exposición va principalmente dirigida a aquellos aspectos de su vida que están estricta y estrechamente ligados a su gestión pública. Véase A.M. Romero Coloma, supra. A veces, si no siempre, la línea divisoria de lo anterior es gris, en su tonalidad más clara. No obstante, en los hechos que nos ocupan no albergamos duda de que la imputación de adulterio al Sr. Krans laceró un área neurálgica de su vida la cual está clara y nítidamente definida como su intimidad, su vida privada. Para nada la divulgación de infidelidad puede relacionarse a las gestiones públicas del Demandante. Nada aportan a la discusión pública de ideas en la cual se ha involucrado el Sr. Krans. Para que quede despejada toda duda, distinto podría ser el caso si el Demandante, por ejemplo, presidiera alguna coalición o alianza en defensa de los derechos de la familia y el matrimonio.
Por el contrario, el Sr. Krans sí era el esposo de la entonces gobernadora, pero aún así, gozaba como cualquier esposo o esposa de un funcionario, del derecho a la protección de su vida íntima. [4] Sencillamente, el Sr. Santarrosa no puede convencemos de que estaba ejecutando un acto informativo periodístico o noticioso, digno de protección constitucional, cuando a sabiendas y con grave menosprecio de la falsedad de la infidelidad, decidió publicarla. Tal maliciosa difamación carece de protección constitucional. Añádase, como muy bien destaca el Sr. Santarrosa en su apelación, que una relación de infidelidad es un asunto privado. Véase KLAN-2006-00512, páginas 17-18. Como antes señalamos, el Sr. Krans no renunció absolutamente al disfrute de sus derechos constitucionales de tener al menos una porción de su vida que fuera íntima y privada.
En virtud de la precedente exposición, análisis y aplicación del Derecho, resolvemos confirmar la apelada Sentencia, por todo lo cual, declaramos sin lugar los tres recursos de apelación consolidados.
La magnitud del ataque que representa la difamación y la herida que le imprime tanto al derecho a la libertad de expresión como al derecho a la dignidad y la honra, amerita la confirmación de la cuantía concedida por el TPI. Igual suerte corre la partida de honorarios por temeridad.
En síntesis, ninguno de los señalamientos de errores de los apelantes se cometió. Entiéndase que las cuantías concedidas se ajustan perfectamente a la naturaleza del caso, pues los derechos en conflicto, la actualización de las cuantías de otros casos similares, y sobre todo, la prueba desfilada, las justifican. Además, la temeridad de los Demandados es patente. Conocían la falsedad de la infidelidad, pues no tenían las fuentes informativas y de corroboración que dijeron poseer, y aún así, publicaron la perjudicial calumnia. El vídeo era visible, pero su contenido era inexistente; estaba vacío. Resultaba, por tanto, inevitable e inescapable la imposición de honorarios por temeridad.
Sobre los daños económicos que insiste el Sr. Krans que sufrió y probó en juicio, como bien consignó el TPI en la apelada Sentencia, la prueba pericial al respecto no fue confiable ni convincente. Coincidimos con el TPI, pues aunque la merma económica fue coetánea a la difamación, no quedó establecido satisfactoriamente el nexo causal necesario.
*0 [[Image here]]
[[Image here]]
[[Image here]]
[[Image here]]
*1052 Sobre la procedencia de daños por la maliciosa difamación, todos los requisitos quedaron probados a la saciedad; desde la concurrencia de los tres elementos exigidos por el Artículo 1802, supra, hasta la existencia de malicia real, y la anulación de la aplicación de la hipérbole retórica.
III
En mérito de todo lo anteriormente expresado, confirmamos la Sentencia.
Así lo pronunció y manda el Tribunal y lo certifica la Secretaria.
Leda. María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones
ESCOLIOS 2007 DTA 48
1. Leo III participaba como investigador y corresponsal en SuperXclusivo para la época en que el Sr. Santarrosa hizo las expresiones difamatorias del Sr. Krans.
2. Nos referimos a Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657 (1989); New York Times v. Sullivan, supra, 285-286 (1964); Asoc. Med. Podiátrica v. Romero Bassó, res. el 18 de junio de 2002, 2002 JTS 87, y Garib Bazain v. Clavell, supra.
3. La Ley Número 388 del 8 de septiembre de 2000, autorizó a la industria bancada a entrar en el negocio de compraventa de seguros.
4. En Puerto Rico, la Sra. Calderón ha sido la primera y única gobernadora, por lo cual, es ajeno a nuestra historia y tradición, el que haya un esposo de la gobernadora en Fortaleza que sea tan activo en diversas causas, como lo han sido las primeras damas del pasado. De hecho, durante la gobernación de la Sra. Calderón, la Oficina de la Primera Dama estuvo a cargo de sus hijas.